IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| GENNEL EDWARD MILES, JR., | No. 2:19-CV-0377-KJM-DMC-P |
| Petitioner, | |
| v. | FINDINGS AND RECOMMENDATIONS |
| BRYAN D. PHILLIPS, | |
| Respondent. | |

Petitioner, a prisoner proceeding with retained counsel, brings this petition for a writ of habeas corpus. Pending before the Court are Petitioner's amended petition for a writ of habeas corpus, ECF No. 47, Respondent's answer, ECF No. 50, and Petitioner's traverse, ECF No. 51. Respondent has lodged the state court record. See ECF Nos. 12 and 41.

Because this action was filed after April 26, 1996, the provisions of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") are presumptively applicable. See Lindh v. Murphy, 521 U.S. 320, 336 (1997); Calderon v. United States Dist. Ct. (Beeler), 128 F.3d 1283, 1287 (9th Cir. 1997), cert. denied, 522 U.S. 1099 (1998). Under AEDPA, federal habeas relief under 28 U.S.C. § 2254(d) is not available for any claim decided on the merits in

/ / /

/ / /

/ / /

state court proceedings unless the state court's adjudication of the claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

Under § 2254(d)(1), federal habeas relief is available only where the state court's decision is "contrary to" or represents an "unreasonable application of" clearly established law. Under both standards, "clearly established law" means those holdings of the United States Supreme Court as of the time of the relevant state court decision. See Carey v. Musladin, 549 U.S. 70, 74 (2006) (citing Williams, 529 U.S. at 412). "What matters are the holdings of the Supreme Court, not the holdings of lower federal courts." Plumlee v. Masto, 512 F.3d 1204 (9th Cir. 2008) (en banc). For federal law to be clearly established, the Supreme Court must provide a "categorical answer" to the question before the state court. See id.; see also Carey, 549 U.S. at 76-77 (holding that a state court's decision that a defendant was not prejudiced by spectators' conduct at trial was not contrary to, or an unreasonable application of, the Supreme Court's test for determining prejudice created by state conduct at trial because the Court had never applied the test to spectators' conduct). Circuit court precedent may not be used to fill open questions in the Supreme Court's holdings. See Carey, 549 U.S. at 74.

In Williams v. Taylor, 529 U.S. 362 (2000) (O'Connor, J., concurring, garnering a majority of the Court), the United States Supreme Court explained these different standards. A state court decision is "contrary to" Supreme Court precedent if it is opposite to that reached by the Supreme Court on the same question of law, or if the state court decides the case differently than the Supreme Court has on a set of materially indistinguishable facts. See id. at 405. A state court decision is also "contrary to" established law if it applies a rule which contradicts the governing law set forth in Supreme Court cases. See id. In sum, the petitioner must demonstrate that Supreme Court precedent requires a contrary outcome because the state court applied the wrong legal rules. Thus, a state court decision applying the correct legal rule from Supreme Court cases to the facts of a particular case is not reviewed under the "contrary to" standard. See id. at

2

1  406.  If a state court decision is "contrary to" clearly established law, it is reviewed to determine
2  first whether it resulted in constitutional error.  See Benn v. Lambert, 283 F.3d 1040, 1052 n.6
3  (9th Cir. 2002).  If so, the next question is whether such error was structural, in which case federal
4  habeas relief is warranted.  See id.  If the error was not structural, the final question is whether the
5  error had a substantial and injurious effect on the verdict, or was harmless.  See id.

6  State court decisions are reviewed under the far more deferential "unreasonable
7  application of" standard where it identifies the correct legal rule from Supreme Court cases, but
8  unreasonably applies the rule to the facts of a particular case.  See Wiggins v. Smith, 539 U.S.
9  510, 520 (2003).  While declining to rule on the issue, the Supreme Court in Williams, suggested
10 that federal habeas relief may be available under this standard where the state court either
11 unreasonably extends a legal principle to a new context where it should not apply, or
12 unreasonably refuses to extend that principle to a new context where it should apply.  See
13 Williams, 529 U.S. at 408-09.  The Supreme Court has, however, made it clear that a state court
14 decision is not an "unreasonable application of" controlling law simply because it is an erroneous
15 or incorrect application of federal law.  See id. at 410; see also Lockyer v. Andrade, 538 U.S. 63,
16 75-76 (2003).  An "unreasonable application of" controlling law cannot necessarily be found even
17 where the federal habeas court concludes that the state court decision is clearly erroneous.  See
18 Lockyer, 538 U.S. at 75-76.  This is because "[t]he gloss of clear error fails to give proper
19 deference to state courts by conflating error (even clear error) with unreasonableness."  Id. at 75.
20 As with state court decisions which are "contrary to" established federal law, where a state court
21 decision is an "unreasonable application of" controlling law, federal habeas relief is nonetheless
22 unavailable if the error was non-structural and harmless.  See Benn, 283 F.3d at 1052 n.6.

23 The "unreasonable application of" standard also applies where the state court
24 denies a claim without providing any reasoning whatsoever.  See Himes v. Thompson, 336 F.3d
25 848, 853 (9th Cir. 2003); Delgado v. Lewis, 223 F.3d 976, 982 (9th Cir. 2000).  Such decisions
26 are considered adjudications on the merits and are, therefore, entitled to deference under the
27 AEDPA.  See Green v. Lambert, 288 F.3d 1081 1089 (9th Cir. 2002); Delgado, 223 F.3d at 982.
28 The federal habeas court assumes that state court applied the correct law and analyzes whether the

3

state court's summary denial was based on an objectively unreasonable application of that law. See Himes, 336 F.3d at 853; Delgado, 223 F.3d at 982.

## I. BACKGROUND

### A. Facts[1]

The following facts are recited by the California Court of Appeal in its opinion on direct review affirming Petitioner's conviction and sentence, and Petitioner has not presented any evidence to rebut the presumption that these facts are correct. The Court of Appeal outlined the facts of the case as follows:

> In 2008, Timothy and Tiffany Brodie, with their son, lived on Lemon Drop Court in south Sacramento, where Timothy Brodie (we'll refer to him as "Brodie") grew marijuana. They owned a Ford Excursion, which they bought with casino winnings, and they kept the remaining $8,000 of winnings hidden under their carpet. Brodie, along with Anthony Silva and defendant Sam, grew and sold marijuana.
> In November (all dates are in 2008, unless otherwise specified), defendant Sam was arrested for assaulting his girlfriend, Dominique Buffington, at defendant Sam's house. The arresting officer observed fresh drops of blood on the carpet. While defendant Sam was incarcerated for the assault, Brodie and Silva moved marijuana that had been growing in defendant Sam's house over to Brodie's house. Defendant Sam was released from custody on December 9.
> *December 19*
> Defendant Sam, who lived on Emerald Creek Court, close to Brodie's house, called Brodie at approximately 9:00 p.m. on December 19. After the call, Brodie told his wife he was going to sell some marijuana and would be right back. He left in the Excursion and took a garage door opener.
> About 15 minutes after Brodie left, Tiffany Brodie heard the garage door opening. Three men then broke into the house from the garage. They were African Americans and were wearing dark clothing, ski masks, and gloves. One had a small handgun, and another had a shotgun.
> The men tied up Tiffany Brodie and left her and her son on a bed while they cut the marijuana plants and hauled them out of the house. While she was tied up on the bed, one of the men talked to her, referring to her as "ma." The man also referred to her husband as "Tim." The men finally left the house, and she was able to untie herself.

---

[1] Pursuant to 28 U.S.C. § 2254(e)(1), ". . . a determination of a factual issue made by a State court shall be presumed to be correct." Findings of fact in the last reasoned state court decision are entitled to a presumption of correctness, rebuttable only by clear and convincing evidence. See Runningeagle v. Ryan, 686 F.3d 759 n.1 (9th Cir. 2012). Petitioner bears the burden of rebutting this presumption by clear and convincing evidence. See id. These facts are, therefore, drawn from the state court's opinion(s), lodged in this court. Petitioner may also be referred to as "defendant."

    Tiffany Brodie called Brodie's cell phone at 10:08 p.m., but no one answered. She left the house and went to Silva's house. But she did not call 911 because the men told her not to call the police and because marijuana had been growing in the house. She told Silva's wife that one of the men had called her "ma," and Silva's wife told her that Defendant Sam uses the word "ma," which Tiffany Brodie then remembered.

    Meanwhile, defendants were moving toward Rancho Cordova, specifically the Cobblestone Apartments, as shown by their cell phone records. At 10:40 p.m., Brodie's Excursion was at the Cobblestone Apartments, where Defendant Miles lived. Brodie was shot six times, and he died in the parking lot of the apartments.

*Brodies' House after the Crimes*

    Early in the morning on December 20, Tiffany Brodie returned to her house to retrieve diapers and the money from under the carpet. Later that day, Silva, with the help of others, brought a U-Haul truck to the Brodies' house and took away everything associated with the marijuana grow.

*Defendant Miles's Statements*

    Also, on the morning after the murder, Defendant Miles called his friend Robert Collins, who was in Reno. Collins related the conversation to his girlfriend, Brittney Ashcraft. Defendant Miles said that he was not involved in the robbery and killing of a man. Defendants Miles, Shorter, and Sam lured the victim to Defendant Sam's house, where they tied him up. They then took the victim's car over to the victim's house, where they used the garage door opener to get inside. They tied up the victim's wife and child and took the marijuana at the house. Later, the three men took the victim and his car to Defendant Miles's apartment complex, and Defendant Miles shot the victim.

*Arson of Excursion*

    At 7:40 p.m. on December 20, Brodie's Excursion was found on fire in Carmichael on Wayside Lane. Defendant Miles's cell phone had been in that area five hours earlier, at around 2:54 p.m., and Defendant Sam's cell phone was in that area at 7:06 p.m., shortly before the fire.

*Autopsy*

    Brodie was shot six times, causing him to bleed to death. But there were also many other injuries on his body: lacerations and abrasions on his legs, possibly caused by a belt, as well as lacerations, abrasions, and bruising on his head. Brodie's skull was fractured into pieces and significantly damaged from as many as seven blunt force blows. The head injuries likely occurred before Brodie was shot.

*Defendant Sam's House*

    In January 2009, Defendant Sam's house was examined, and Brodie's blood was found on the dining room ceiling. A pathologist testified that the blood on the ceiling could have been cast off while Brodie suffered repeated blunt force injuries to the head. Carpeting had been in the dining room in November 2008 was missing. Fibers found on duct tape on Brodie when he died and on a roll of duct tape in the burnt Excursion matched the carpet in Defendant Sam's house.

ECF No. 41-22, pgs. 1-5.

///

///

B.     **Procedural History**

The Court of Appeal recited the following procedural history related to conviction and sentencing:

- Carjacking – base term – 18-year determinate term (§ 215; count six) (the determinate terms were doubled under the "Three Strikes" law because defendant Miles had a prior serious felony conviction. (§ 667, subd. (e)(1)));
- Kidnapping – three-year four-month consecutive determinate term (§ 207, subd. (a); count three);
- Arson – one-year four-month consecutive determinate term (§ 451, subd. (d); count five);
- Prior serious felony conviction enhancement – five-year consecutive determinate term (§ 667, subd. (a)); and
- First degree murder with a robbery murder special circumstance – consecutive indeterminate term of life without possibility of parole (§§ 187, subd. (a), 190.2, subd. (a)(17); count one).

Defendant Miles's aggregate sentence was for a determinate term of 27 years eight months, followed by a consecutive indeterminate term of life without possibility of parole.

Defendant Miles was also convicted of robbery with a finding that the robbery was committed in concert (§§ 211, 213, subd. (a)(1)(A); count two), but punishment was stayed because the robbery was the basis for the special circumstance. Terms for enhancements were stayed.

The jury acquitted defendant Miles of torture (§ 206; count four) and possession of a firearm by a felon (§ 12021, subd. (a)(1); count seven) and found not true the special-circumstance allegations of kidnapping murder and torture (§ 190.2, subd. (a)(17) & (18)).

ECF No. 41-22, pgs. 6-7.

The California Court of Appeal struck the arson conviction and the associated prison terms were struck. As modified, the judgment to Petitioner was affirmed on August 7, 2016, in People v. Miles, Jr, case no. C073919 (unpublished). See ECF No. 41-22. The California Supreme Court denied direct review on December 14, 2016, without comment or citation. See ECF No. 41-26.

Petitioner later filed three pro se state post-conviction collateral challenges, all petitions for writs of habeas corpus. See ECF No. 1, pg. 55. Petitioner filed his first action in the Sacramento County Superior Court, which denied Petitioner's petition on January 9, 2018. See ECF No. 12-6, pg. 1. Petitioner filed his second action in the California Court of Appeal, which denied relief on April 13, 2018, without comment or citation. See ECF No. 12-8, pg.1. Petitioner filed his third action in the California Supreme Court, which denied relief on December 12, 2018,

6

1  also without comment or citation. See ECF No. 12-10, pg.1.

2         The instant federal petition was filed on March 4, 2019. See ECF No. 1.
3  Petitioner's amended petition was filed on November 29, 2021.  See ECF No. 47.  Petitioner
4  raises four claims: (1) trial counsel provided ineffective assistance of counsel as to the motion to
5  exclude Ashcraft's testimony; (2) the prosecution withheld material exculpatory and
6  impeachment evidence in violation of Mile's due process rights and Brady v. Maryland; (3)
7  admission of Ashcraft's report of the supposed phone call between Miles and Collins violated
8  Mile's right to due process; and (4) the cumulative effect of the errors at Mile's trial mandates
9  habeas relief. See ECF No. 47, pgs. 1-4.  Petitioner has voluntarily withdrawn his cumulative
10  error claim as unexhausted. See ECF No. 58.

## II. DISCUSSION

13         Before the Court are the following three remaining claims: (1) trial counsel was
14  ineffective in litigating the motion to exclude Ashcraft's testimony; (2) the prosecution withheld
15  material exculpatory and impeachment evidence in violation of Petitioner's due process rights
16  and Brady v. Maryland; and (3) the trial court erred in admitting Ashcraft's report of the alleged
17  phone call between Petitioner and Collins.  See ECF No. 47.  In the answer, Respondent argues
18  that Petitioner is not entitled to federal habeas relief on any of his claims because the state court's
19  determinations were reasonable.  See ECF No. 50.

20      **A.**    **Ineffective Assistance of Counsel**

21         Petitioner claims that trial counsel provided ineffective assistance in litigating the
22  motion to exclude Ashcraft's testimony. See ECF No. 47, pgs. 38-39. Petitioner asserts that
23  counsel performed ineffectively in failing to rebut the prosecution's argument that Ashcraft's had
24  knowledge of "hold-back" information by showing that detectives provided it freely during
25  interviews. See id.  Additionally, Petitioner contends that he suffered prejudice as a result of
26  counsel's failures because the trial court would have likely excluded Ashcraft's unreliable
27  statement based on the true source of the information. See id.
28  / / /

7

The Sixth Amendment guarantees the effective assistance of counsel. The United States Supreme Court set forth the test for demonstrating ineffective assistance of counsel in Strickland v. Washington, 466 U.S. 668 (1984). First, a petitioner must show that, considering all the circumstances, counsel's performance fell below an objective standard of reasonableness. See id. at 688. To this end, petitioner must identify the acts or omissions that are alleged not to have been the result of reasonable professional judgment. See id. at 690. The federal court must then determine whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professional competent assistance. See id. In making this determination, however, there is a strong presumption "that counsel's conduct was within the wide range of reasonable assistance, and that he exercised acceptable professional judgment in all significant decisions made." Hughes v. Borg, 898 F.2d 695, 702 (9th Cir. 1990) (citing Strickland, 466 U.S. at 689).

Second, a petitioner must affirmatively prove prejudice. See Strickland, 466 U.S. at 693. Prejudice is found where "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694. A reasonable probability is "a probability sufficient to undermine confidence in the outcome." Id.; see also Laboa v. Calderon, 224 F.3d 972, 981 (9th Cir. 2000). A reviewing court "need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies . . . If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice . . . that course should be followed." Pizzuto v. Arave, 280 F.3d 949, 955 (9th Cir. 2002) (quoting Strickland, 466 U.S. at 697).

///
///
///
///
///
///

The Sacramento County Superior Court addressed Petitioner's ineffective assistance of counsel claim in denying Petitioner's first state petition for habeas corpus, beginning its discussion with a summary of the applicable standard under Strickland. See ECF No. 41-28, pg. 2. The state court then concluded as follows:

> Petitioner claims that trial counsel should have further investigated Ashcraft's statement to show it was fabricated, unreliable, and biased. In particular, Petitioner claims that Ashcraft's testimony was admitted in part because the prosecutor argued that it was reliable and credible because it included information about the crimes that was not publicly disclosed, including that burglars used the victim's garage door opener to gain entrance into the home. Petitioner claims that trial counsel should have discovered that Detective Turnbull disclosed much of the information to Reggie Gilbert, who was in a relationship with Ashcraft. Petitioner speculates that Ashcraft obtained the information from Gilbert instead of from Collins, as she testified. However, the interview of Gilbert (attached as Exhibit A) only states that the burglars entered the garage without kicking the door; the garage door opened. Turnbull did not say that the burglars used the victim's garage door opener. In contrast, in Ashcraft's statement, she stated that Petitioner told Collins that the burglars took the victim's car to his house and used the garage door opener to get inside the house. (Exhibit B at p. 18.) Therefore, Petitioner has not shown that a further investigation would have been useful in attacking Ashcraft's credibility. In addition, the trial court did not base its decision to admit Ashcraft's testimony solely or even primarily on the fact that she knew information that only the participants could have known. Instead, the court considered a variety of information, including that several parts of Ashcraft's statement were corroborated by other evidence in the case. The court acknowledged that it was possible that Ashcraft could have gotten this information from some source other than Petitioner/Collins, but determined that her statements were sufficiently reliable overall, after considering the totality of the circumstances, to be admitted. (See Exhibit C at p. 7.) As a result, Petitioner has not shown that trial counsel's failure to further investigate how Ashcraft learned the facts of the crime was unreasonable.

ECF No. 41-28, pg. 1-4.

The Court agrees with Respondent that the state court did not unreasonably apply the facts to the Strickland standard. As the state court observed, Ashcraft's knowledge of information not publicly disclosed but disclosed to Gilbert, who was in a relationship with Ashcraft, was not the moving force behind the trial court's finding that Ashcraft's testimony was otherwise reliable. Because there was other evidence of reliability, any further investigation by counsel into what is essentially a futile theory that Ashcraft obtained information from Gilbert cannot constitute deficient performance, see Rupe v. Wood, 93 F.3d 1434, 1445 (9th Cir. 1996),

or be prejudicial, see Matylinsky v. Budge, 577 F.3d 1083, 1094 (9th Cir. 2009).

**B.      Failure to Disclose Exculpatory Evidence**

Petitioner claims that the prosecution withheld material exculpatory and impeachment evidence until after preliminary hearings in violation of his due process rights and Brady v. Maryland, 373 U.S. 83 (1963). See ECF No. 47, pgs. 42-44. Specifically, Petitioner asserts that the Metro PCS cell phone records showed that the call Ashcraft described in her testimony did not occur. See id. According to Petitioner, the records were exculpatory evidence that proved that Petitioner had not called Collins to confess his participation in the crime the day after it occurred. See id.

This claim was raised in Petitioner's third state post-conviction action, which was summarily denied by the California Supreme Court. See ECF No. 41-30. Though there is no reasoned state court decision on the merits of this claim, the Court nonetheless concludes that, on the face of the amended petition, Petitioner is not entitled to habeas relief. First, as Respondent notes, federal habeas relief is unavailable because there is no Supreme Court precedent which clearly establishes that the Brady rule applies at the preliminary hearing stage. See Carey, 549 U.S. at 74. Second, as Petitioner concedes, he received the evidence after the preliminary hearing. Therefore, Petitioner was not precluded from presenting his theory regarding the phone calls at the time of trial. Further, because Petitioner was ultimately provided with the evidence at issue prior to trial, the Brady claim fails outright. See United States v. Dupuy, 760 F.2d 1492, 1502 n.5 (9th Cir. 1985).

**C.      Admission of Ashcraft's Report**

Petitioner claims that the admission of Ashcraft's report of the alleged phone call between Petitioner and Collins violated Petitioner's right to due process. See ECF No. 47, pgs. 44-47. Petitioner emphasizes that Ashcraft's statement about the supposed call was demonstrably false, based on double-hearsay, and should have been excluded. See id.

/ / /

/ / /

/ / /

The state court addressed the false evidence component of Petitioner's claim in denying Petitioner's first post-conviction action. See ECF No. 41-28. As to the false evidence assertion, the state court held:

> Petitioner claims that "false evidence" was admitted at trial. However, the true nature of the claim is that Ashcraft's testimony was admitted even though it was unreliable, not credible, and biased. Petitioner presents no evidence that Ashcraft's testimony was actually knowingly false. As a result, he has not shown that any false evidence was presented at any trial hearing.
>
> ECF 41-28, pg. 2.

The state court addressed Ashcraft's reliability on direct appeal. See ECF No. 41-22. The California Court of Appeal first outlined the following background:

> Before retrial, the trial court considered motions by defendants to exclude the phone conversation between defendant Miles and Collins, as related by Ashcraft. The court reviewed relevant parts of (1) a DVD of the statement that Ashcraft gave to law enforcement, (2) the reporter's transcript of the preliminary hearing, (3) the reporter's transcript of the Evidence Code section 402 hearing held before the first trial, and (4) the reporter's transcript of the first trial. We need not recount the statement or testimony given on each occasion, but instead provide a summary.
> On May 21, 2009, five months after the murder of Timothy Brodie, Brittney Ashcraft was interviewed about an unrelated case. She told the detective that she had information about the Brodie murder, but she did not want to get involved. Two months later, on July 15, 2009, she was interviewed about the Brodie murder. She had difficulty remembering all the details from seven months earlier.
> Ashcraft reported that, on December 19, 2008, the date of the Brodie murder, she went with her boyfriend, Robert Collins, to defendant Miles's apartment at the Cobblestone Apartments. Several other people were at the apartment. Ashcraft and Collins left the apartment with defendant Miles and defendant Shorter and traveled to defendant Sam's house. Shortly after that, Ashcraft and Collins left for Reno.
> Ashcraft believed she and Collins stayed in Reno for five days, but a receipt from the motel showed that they were there only three days. She remembered that, on the morning after they arrived in Reno, defendant Miles called her cell phone, a number with a 606 prefix. She saw who it was on the caller ID, so she handed it to Collins. After the call, Collins told her what defendant Miles told him. Defendant Miles said that, after Ashcraft and Collins left defendant Sam's house, defendant Miles was involved in the robbery and killing of a man. Defendants Miles, Shorter, and Sam lured the victim to defendant Sam's house, where they tied him up. They then took the victim's car over to the victim's house, where they used the garage door opener control to get inside. They tied up the victim's wife and child and took the marijuana at the house. Later, the three men took the victim and his car to defendant Miles's apartment complex, and defendant Miles shot the victim back.

11

>Ashcraft said that defendant Miles told Collins that defendant Sam "set the whole thing up." Defendant Sam called Brodie to come over, and that is when they tied him up.
>After Ashcraft and Collins returned to Sacramento from Reno, Ashcraft learned that defendant Miles told Collins that defendants killed Brodie because he knew defendant Sam. Ashcraft also learned that they burned Brodie's car.
>Collins testified at the first trial that he did not hear about the Brodie murder until he and Ashcraft were on their way home from Reno. He received the information in a phone call from a friend named Eric Hale. The phone conversation lasted more than 15 minutes. Collins was worried about defendant Miles, who lived in the apartments where the murder occurred, so he called defendant Miles. That conversation lasted more than 10 minutes. Defendant Miles told Collins that nothing happened to him. Collins denied telling Ashcraft (1) that defendant Miles told him he was involved in the Brodie murder or (2) any of the other facts reported by Ashcraft later.
>The records for Ashcraft's phone did not show a call from defendant Miles to her phone on the morning after the Brodie murder. When confronted with this information, Ashcraft said that she was not sure why the call was not on the phone records and that the call may have occurred at some other time.
>The trial court admitted the evidence of defendant Miles's statements. It ruled that (1) defendant Miles's statements were declarations against penal interest under Evidence Code section 1230, (2) the statements were not testimonial, and (3) they were sufficiently trustworthy. Concerning the absence of phone records supporting Ashcraft's claim about the call from defendant Miles to Collins, the court said: "The Court is aware that the cell phone records do not provide proof of a call made the day after. But based on the totality of circumstances, the Court is satisfied that the call occurred reasonably close in time to the homicide." On the issue of trustworthiness, the court noted that the conversation between defendant Miles and Collins was between friends and that defendant Miles did not try to minimize his responsibility. Finally, the court found no problem with multiple layers of hearsay. Defendant Miles's statements to Collins were against penal interest, and Collins's statements to Ashcraft were prior statements inconsistent with his claim that he never made the statements.

ECF No. 41-22, pgs. 8-10.

As to reliability, the Court of Appeal concluded:

>Defendants Miles and Shorter contend that Brittney Ashcraft's statements (and testimony) concerning what Collins told her about his conversation with defendant Miles were not sufficiently reliable to be admissible as a matter of due process and confrontation rights because the phone records did not support her recollection about when the call was made. Defendant Miles goes so far as to say that "Ashcraft's report of the 'phantom' call was demonstrably false." To the contrary, there was sufficient evidence to sustain the trial court's reliability determination.

///

> The trial court, in ruling on the admissibility of Ashcraft's statements, said: "The Court is aware that the cell phone records do not provide proof of a call made the day after [the murder]. But based on the totality of the circumstances, the Court is satisfied that the call occurred reasonably close in time to the homicide."
> As we consider the reliability of Ashcraft's statements, we start with the recognition that Ashcraft's trial testimony was not hearsay. Her testimony included hearsay of other declarants, which we have discussed, but her testimony, itself, did not constitute hearsay. (See Evid. Code, § 1200, subd. (a) [hearsay as "evidence of a statement that was made other than by a witness while testifying at the hearing"].) She was fully subject to cross-examination, and the cases discussing the admissibility of hearsay cited by defendants are inapplicable.
> To the extent a video recording of her interview was used, that evidence constituted hearsay because it was not in-court testimony. However, the concerns associated with hearsay statements were greatly diminished because she was subject to cross-examination at trial, which allowed defendants to test the reliability of the statements Ashcraft made in the video recording. As a matter of constitutional law, "when the declarant appears for cross-examination at trial, the Confrontation Clause places no constraints at all on the use of his prior testimonial statements." (*Crawford v. Washington* (2004) 541 U.S. 36, 59, fn. 9 [158 L.Ed.2d 177, 197].) As the trial court said at the pretrial hearing, "[b]oth witness Collins and witness Ashcraft will be rigorously and vigorously examined and cross-examined as to their statements. The jury is the trier of facts and determines the credibility of witnesses. And they will have the opportunity to decide whether any of these statements were made in whole or in part and whether they should believe any of those statements in whole or in part."
> Under these circumstances, the fact that the phone records did not corroborate Ashcraft's statements did not render those statements inadmissible. As the trial court noted, there was communication between Collins and defendant Miles within a reasonable time after the Brodie murder. And the evidence supports an inference that Collins was with Ashcraft when the communication occurred. That Ashcraft, when questioned about the call seven months later (in the case of her recorded statement) or years later (in the case of trial), remembered the call being on a specific phone at a specific time that was not supported by phone records, did not make the statement so unreliable that it was constitutionally inadmissible.
> The trial court did not err in admitting the statements of defendant Miles, Collins, and Ashcraft concerning the events surrounding the Brodie murder.

ECF No. 41-22, pgs. 13-15.

Petitioner's claim has two components. First, Petitioner asserts that Ashcraft's testimony included improper hearsay. Second, Petitioner argues that the trial court erred in admitting Ashcraft's testimony because it was not reliable. The Court addresses each component below.

///

13

1. <u>Hearsay</u>

The Confrontation Clause protects a defendant from unreliable hearsay evidence being presented against him during trial. See U.S. Constitution, Amendment VI. Prior to the Supreme Court's decision in Crawford v. Washington, 541 U.S. 36 (2004), the admission of hearsay evidence did not violate the Confrontation Clause where the hearsay fell within a firmly rooted exception to the hearsay rule or otherwise contained "particularized guarantees of trustworthiness." Lilly v. Virginia, 527 U.S. 116, 123-24 (1999); Ohio v. Roberts, 448 U.S. 56, 66 (1980). In Crawford, however, the Supreme Court announced a new rule: Out-of-court statements by witnesses not appearing at trial that are testimonial are barred under the Confrontation Clause unless the witnesses are unavailable and the defendant had a chance to cross-examine, regardless of whether such statements are deemed reliable by the trial court. See 541 U.S. at 51. If error occurred, the next question is whether such error was harmless. See Bockting v. Bayer, 399 F.3d 1010, 1022 (9th Cir. 2005) (applying harmless error analysis).

While the Supreme Court in Crawford "le[ft] for another day any effort to spell out a comprehensive definition of 'testimonial,'" the Court provided some guidance. 541 U.S. at 68. The Court observed that "[a]n accuser who makes a formal statement to government officers bears testimony in a sense that a person who makes a casual remark to an acquaintance does not." Id. at 51; see also Davis v. Washington, 547 U.S. 813 (2006) (holding that law enforcement interrogations directed at establishing the facts of a past crime or in order to identify the perpetrator are testimonial).

To the extent Petitioner contends that Ashcraft's testimony included improperly hearsay, the Court finds that the state court's determination was based on a reasonable application of the facts to clearly established federal law. Specifically, as the Court of Appeal observed, Ashcraft was subject to cross-examination at trial. Thus, there was no constraint on the use of Ashcraft's out-of-court statements. See Crawford, 541 U.S. at 59, n.9.

/ / /

/ / /

/ / /

2. <u>Reliability</u>

A writ of habeas corpus is available under 28 U.S.C. § 2254 only on the basis of a transgression of federal law binding on the state courts. See <u>Middleton v. Cupp</u>, 768 F.2d 1083, 1085 (9th Cir. 1985); <u>Gutierrez v. Griggs</u>, 695 F.2d 1195, 1197 (9th Cir. 1983). It is not available for alleged error in the interpretation or application of state law. <u>Middleton</u>, 768 F.2d at 1085; <u>see also</u> <u>Lincoln v. Sunn</u>, 807 F.2d 805, 814 (9th Cir. 1987); <u>Givens v. Housewright</u>, 786 F.2d 1378, 1381 (9th Cir. 1986). Habeas corpus cannot be utilized to try state issues de novo. See <u>Milton v. Wainwright</u>, 407 U.S. 371, 377 (1972).

However, a "claim of error based upon a right not specifically guaranteed by the Constitution may nonetheless form a ground for federal habeas corpus relief where its impact so infects the entire trial that the resulting conviction violates the defendant's right to due process." <u>Hines v. Enomoto</u>, 658 F.2d 667, 673 (9th Cir. 1981) (citing <u>Quigg v. Crist</u>, 616 F.2d 1107 (9th Cir. 1980)); <u>see also</u> <u>Lisenba v. California</u>, 314 U.S. 219, 236 (1941). Because federal habeas relief does not lie for state law errors, a state court's evidentiary ruling is grounds for federal habeas relief only if it renders the state proceedings so fundamentally unfair as to violate due process. See <u>Drayden v. White</u>, 232 F.3d 704, 710 (9th Cir. 2000); <u>Spivey v. Rocha</u>, 194 F.3d 971, 977-78 (9th Cir. 1999); <u>Jammal v. Van de Kamp</u>, 926 F.2d 918, 919 (9th Cir. 1991); <u>see also</u> <u>Hamilton v. Vasquez</u>, 17 F.3d 1149, 1159 (9th Cir. 1994). To raise such a claim in a federal habeas corpus petition, the "error alleged must have resulted in a complete miscarriage of justice." <u>Hill v. United States</u>, 368 U.S. 424, 428 (1962); <u>Crisafi v. Oliver</u>, 396 F.2d 293, 294-95 (9th Cir. 1968); <u>Chavez v. Dickson</u>, 280 F.2d 727, 736 (9th Cir. 1960). In any event, an evidentiary error is considered harmless if it did not have a substantial and injurious effect in determining the jury's verdict. See <u>Padilla v. Terhune</u>, 309 F.3d 614, 621 (9th Cir. 2002); <u>see also</u> <u>Laboa v. Calderon</u>, 224 F.3d 972, 976 (9th Cir. 2001).

Here, the Court finds that Petitioner cannot meet the high bar of showing that admission of Ashcraft's testimony resulted in a complete miscarriage of justice. As the state courts have observed throughout the various levels of review, Ashcraft was subject to cross-examination at trial. Thus, Petitioner was free to argue to the jury that Ashcraft's should not be

believed, and it was for the jury to render a final determination as to credibility. Further, as the state courts have also noted, Ashcraft's testimony was sufficiently reliable notwithstanding Petitioner's contentions regarding phone records. For these same reasons, even if error occurred, Petitioner cannot meet the somewhat lower bar of showing that the error had a substantial and injurious effect on the jury's verdict. Again, and fatal to Petitioner's claim, the record shows that Ashcraft was subject to cross-examination at trial.

### III.  CONCLUSION

Based on the foregoing, the undersigned recommends that Petitioner's amended petition for a writ of habeas corpus, ECF No. 47, be DENIED.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l). Within 14 days after being served with these findings and recommendations, any party may file written objections with the court. Responses to objections shall be filed within 14 days after service of objections. Failure to file objections within the specified time may waive the right to appeal. See Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

Dated:  April 15, 2024

DENNIS M. COTA
UNITED STATES MAGISTRATE JUDGE

16