1

2

3

4

5

6

7

8                    **IN THE UNITED STATES DISTRICT COURT**

9                    **FOR THE EASTERN DISTRICT OF CALIFORNIA**

10

11   GENNEL EDWARD MILES, JR.,                    No.  2:19-CV-0377-KJM-DMC-P

12                    Petitioner,

13          v.                                    AMENDED FINDINGS AND
                                                  RECOMMENDATIONS
14   BRYAN D. PHILLIPS,

15                    Respondent.

16

17                    Petitioner, who is proceeding pro se, brings this petition for a writ of habeas

18   corpus under 28 U.S.C. § 2254.  Pending before the Court are Petitioner's amended petition for a

19   writ of habeas corpus, ECF No. 47, Respondent's answer, ECF No. 50, and Petitioner's traverse,

20   ECF No. 51.  Respondent has lodged the state court record.  See ECF Nos. 12 and 41. This

21   matter is before the undersigned following the District Judge's order referring the case for

22   further consideration of issues presented in the first amended petition. See ECF No. 65.

23   Specifically, the District Judge requested the undersigned consider whether AEDPA deference is

24   appropriate and if an evidentiary hearing is needed. See id. In light of the District Judge's order,

25   the Court will issue these amended findings and recommendations.

26   / / /

27   / / /

28   / / /

                                                  1

# I. BACKGROUND

### A.    **Facts**[1]

The following facts are recited by the California Court of Appeal in its opinion on direct review affirming Petitioner's conviction and sentence. The Court of Appeal outlined the facts of the case as follows:

> In 2008, Timothy and Tiffany Brodie, with their son, lived on Lemon Drop Court in south Sacramento, where Timothy Brodie (we'll refer to him as "Brodie") grew marijuana. They owned a Ford Excursion, which they bought with casino winnings, and they kept the remaining $8,000 of winnings hidden under their carpet. Brodie, along with Anthony Silva and defendant Sam, grew and sold marijuana.
>
> In November (all dates are in 2008, unless otherwise specified), defendant Sam was arrested for assaulting his girlfriend, Dominique Buffington, at defendant Sam's house. The arresting officer observed fresh drops of blood on the carpet. While defendant Sam was incarcerated for the assault, Brodie and Silva moved marijuana that had been growing in defendant Sam's house over to Brodie's house. Defendant Sam was released from custody on December 9.
>
> *December 19*
> Defendant Sam, who lived on Emerald Creek Court, close to Brodie's house, called Brodie at approximately 9:00 p.m. on December 19. After the call, Brodie told his wife he was going to sell some marijuana and would be right back. He left in the Excursion and took a garage door opener.
>
> About 15 minutes after Brodie left, Tiffany Brodie heard the garage door opening. Three men then broke into the house from the garage. They were African Americans and were wearing dark clothing, ski masks, and gloves. One had a small handgun, and another had a shotgun.
>
> The men tied up Tiffany Brodie and left her and her son on a bed while they cut the marijuana plants and hauled them out of the house. While she was tied up on the bed, one of the men talked to her, referring to her as "ma." The man also referred to her husband as "Tim." The men finally left the house, and she was able to untie herself.
>
> Tiffany Brodie called Brodie's cell phone at 10:08 p.m., but no one answered. She left the house and went to Silva's house. But she did not call 911 because the men told her not to call the police and because marijuana had been growing in the house. She told Silva's wife that one of the men had called her "ma," and Silva's wife told her that Defendant Sam uses the word "ma," which Tiffany Brodie then remembered.
> / / /

---

[1]    Pursuant to 28 U.S.C. § 2254(e)(1), ". . . a determination of a factual issue made by a State court shall be presumed to be correct." Findings of fact in the last reasoned state court decision are entitled to a presumption of correctness, rebuttable only by clear and convincing evidence. See Runningeagle v. Ryan, 686 F.3d 759 n.1 (9th Cir. 2012). Petitioner bears the burden of rebutting this presumption by clear and convincing evidence. See id. These facts are, therefore, drawn from the state court's opinion(s), lodged in this court. Petitioner may also be referred to as "defendant."

Meanwhile, defendants were moving toward Rancho Cordova, specifically the Cobblestone Apartments, as shown by their cell phone records. At 10:40 p.m., Brodie's Excursion was at the Cobblestone Apartments, where Defendant Miles lived. Brodie was shot six times, and he died in the parking lot of the apartments.

*Brodies' House after the Crimes*

Early in the morning on December 20, Tiffany Brodie returned to her house to retrieve diapers and the money from under the carpet. Later that day, Silva, with the help of others, brought a U-Haul truck to the Brodies' house and took away everything associated with the marijuana grow.

*Defendant Miles's Statements*

Also, on the morning after the murder, Defendant Miles called his friend Robert Collins, who was in Reno. Collins related the conversation to his girlfriend, Brittney Ashcraft. Defendant Miles said that he was not involved in the robbery and killing of a man. Defendants Miles, Shorter, and Sam lured the victim to Defendant Sam's house, where they tied him up. They then took the victim's car over to the victim's house, where they used the garage door opener to get inside. They tied up the victim's wife and child and took the marijuana at the house. Later, the three men took the victim and his car to Defendant Miles's apartment complex, and Defendant Miles shot the victim.

*Arson of Excursion*

At 7:40 p.m. on December 20, Brodie's Excursion was found on fire in Carmichael on Wayside Lane. Defendant Miles's cell phone had been in that area five hours earlier, at around 2:54 p.m., and Defendant Sam's cell phone was in that area at 7:06 p.m., shortly before the fire.

*Autopsy*

Brodie was shot six times, causing him to bleed to death. But there were also many other injuries on his body: lacerations and abrasions on his legs, possibly caused by a belt, as well as lacerations, abrasions, and bruising on his head. Brodie's skull was fractured into pieces and significantly damaged from as many as seven blunt force blows. The head injuries likely occurred before Brodie was shot.

*Defendant Sam's House*

In January 2009, Defendant Sam's house was examined, and Brodie's blood was found on the dining room ceiling. A pathologist testified that the blood on the ceiling could have been cast off while Brodie suffered repeated blunt force injuries to the head. Carpeting had been in the dining room in November 2008 was missing. Fibers found on duct tape on Brodie when he died and on a roll of duct tape in the burnt Excursion matched the carpet in Defendant Sam's house.

ECF No. 41-22, pgs. 1-5.

**B.    Procedural History**

1.    State Court

The Court of Appeal recited the following related to conviction and sentencing:

Carjacking – base term – 18-year determinate term (§ 215; count six) (the determinate terms were doubled under the "Three Strikes" law because defendant Miles had a prior serious felony conviction. (§ 667, subd. (e)(1)));

1

2
      <u>Kidnapping</u> – three-year four-month consecutive determinate term (§ 207, subd. (a); count three);

3
      <u>Arson</u> – one-year four-month consecutive determinate term (§ 451, subd. (d); count five);

4

5
      <u>Prior serious felony conviction enhancement</u> – five-year consecutive determinate term (§ 667, subd. (a)); and

6

7
      <u>First degree murder with a robbery murder special circumstance</u> – consecutive indeterminate term of life without possibility of parole (§§ 187, subd. (a), 190.2, subd. (a)(17); count one).

8

9
         Defendant Miles's aggregate sentence was for a determinate term of 27 years eight months, followed by a consecutive indeterminate term of life without possibility of parole.

10
         Defendant Miles was also convicted of robbery with a finding that the robbery was committed in concert (§§ 211, 213, subd. (a)(1)(A); count two), but punishment was stayed because the robbery was the basis for the special circumstance. Terms for enhancements were stayed.

11

12
         The jury acquitted defendant Miles of torture (§ 206; count four) and possession of a firearm by a felon (§ 12021, subd. (a)(1); count seven) and found not true the special-circumstance allegations of kidnapping murder and torture (§ 190.2, subd. (a)(17) & (18)).

13

14
ECF No. 41-22, pgs. 6-7.

15
      Petitioner appealed his conviction with his co-defendants and, as a result, the

16
California Court of Appeal struck Petitioner's arson conviction and the associated prison terms.

17
<u>See</u> ECF No. 41-22, pgs. 31-32. Petitioner's judgment, as modified, was affirmed. <u>See id.</u> The

18
California Supreme Court denied direct review on December 14, 2016, without comment or

19
citation. <u>See</u> ECF No. 41-26.

20
      Petitioner later filed three pro se state post-conviction collateral challenges, all

21
petitions for writs of habeas corpus. <u>See</u> ECF No. 1, pg. 55. Petitioner filed his first action in the

22
Sacramento County Superior Court, which denied Petitioner's petition on January 9, 2018. <u>See</u>

23
ECF No. 41-28, pg. 1.  Petitioner filed his second action in the California Court of Appeal,

24
which denied his petition on April 13, 2018, without comment or citation. <u>See</u> ECF No. 12-8.

25
Petitioner filed his third action in the California Supreme Court, which denied relief on

26
December 12, 2018, also without comment or citation. <u>See</u> ECF No. 12-10.

27
/ / /

28
/ / /

4

1          2.          Federal Court

2          Petitioner filed his first petition in the instant case on March 4, 2019. See ECF

3    No. 1. Petitioner's amended petition was filed on November 29, 2021. See ECF No. 47.

4    Petitioner raised four claims: (1) trial counsel provided ineffective assistance of counsel as to the

5    motion to exclude Ashcraft's testimony; (2) the prosecution withheld material exculpatory and

6    impeachment evidence in violation of Petitioner's due process rights and Brady v. Maryland; (3)

7    admission of Ashcraft's report of the supposed phone call between Petitioner and Collins

8    violated Petitioner's right to due process; and (4) the cumulative effect of the errors mandates

9    habeas relief. See ECF No. 47, pgs. 1-4.  Petitioner has voluntarily withdrawn the cumulative

10   error claim as unexhausted. See ECF No. 58.

11         On April 15, 2024, Findings and Recommendations were issued by the

12   undersigned recommending denial of the Amended Petition for Writ of Habeas Corpus. See ECF

13   No. 60. The District Judge did not adopt the previous Findings and Recommendations because:

14         In the findings and recommendations, while setting out the
     AEDPA standards, the magistrate judge did not consider whether the
15   state court's decision is entitled to AEDPA deference in the first instance.
     For example, the magistrate judge did not consider whether the state
16   court's decision not to hold an evidentiary hearing on the ineffective
     assistance of counsel claim rendered "its fact-finding process
17   unreasonable under § 2254(d)(2)." Hibbler v. Benedetti, 693 F.3d 1140,
     1147 (9th Cir. 2012); see Am. Pet. ¶¶ 122–23 (arguing no AEDPA
18   deference warranted because state court "unreasonably failed to issue an
     order to show cause or hold the requested evidentiary hearing"). The
19   magistrate judge also did not consider whether an evidentiary hearing at
     the federal level is warranted in this case. See Hibbler, 693 F.3d at 1147–
20   48 (considering "framework for determining when a district court errs in
     failing to conduct an evidentiary hearing").
21         Accordingly, the court declines to adopt the findings and
     recommendations (ECF No. 60) at this time and refers the matter back to
22   the magistrate judge to 1) consider petitioner's arguments that the state
     court's decision is not entitled to AEDPA deference in the first instance
23   and 2) consider whether an evidentiary hearing is warranted in this case.

24   ECF No. 65, pg. 2.

25         Following the District Judge's order, the undersigned directed the parties to file

26   supplemental briefing. See ECF No. 67. Petitioner's supplemental brief argued that AEDPA

27   deference is inappropriate because AEDPA should be ruled unconstitutional in the wake of the

28   Supreme Court's decision in Loper Bright Enters v. Raimondo, 603 U.S. 369 (2024), and did not

1   provide any additional arguments about the decision to have an evidentiary hearing. See ECF

2   No. 68. Thus, Respondent stated he was unable to respond on the issue of an evidentiary hearing

3   and rested on his prior briefing. See ECF No. 69, pg. 4. Petitioner filed a supplemental reply

4   asserting that Petitioner had fully briefed the issue. See ECF No. 72.

5

6                                  **II.  DISCUSSION**

7              The District Judge directed the undersigned to consider whether the state court's

8   decision was entitled to AEDPA deference and if an evidentiary hearing is warranted. See ECF

9   No. 65. Petitioner argued in supplemental briefing that AEDPA deference is not appropriate

10  because AEDPA is unconstitutional. See ECF No. 68. The Court will begin with considering

11  whether an evidentiary hearing is required. Next, the Court will address the constitutionality of

12  AEDPA. Finally, the Court will consider the merits of Petitioner's three remaining claims, which

13  includes a consideration of whether AEDPA deference is appropriate. Those three claims are, as

14  follows: (1) trial counsel was ineffective in litigating the motion to exclude Ashcraft's testimony;

15  (2) the prosecution withheld material exculpatory and impeachment evidence in violation of

16  Petitioner's due process rights and Brady v. Maryland; and (3) the trial court violated

17  Petitioner's due process rights by admitting Ashcraft's report of the alleged phone call between

18  Petitioner and Collins. See ECF No. 47. Respondent argues that Petitioner is not entitled to

19  federal habeas relief on any of his claims because the state court's determinations were

20  reasonable. See ECF No. 50.

21         **A.    Evidentiary Hearing**

22             The District Judge directed the undersigned to consider whether the state court's

23  decision was entitled to AEDPA deference and if an evidentiary hearing is warranted. See ECF

24  No. 65.  At the outset, this Court will first consider whether the state's factfinding was

25  unreasonable, and if so, whether an evidentiary hearing is needed. As explained further below,

26  this Court finds the state courts' factfinding was unreasonable because it improperly cited the

27  record. However, Petitioner is not entitled to a federal evidentiary hearing because Petitioner was

28  at fault for failing to develop the record in state court, and Petitioner does not show that either of

                                          6

1    the exceptions outlined in 28 U.S.C. § 2254(e)(2) apply here.

2                    1.    <u>State Factfinding</u>

3            The Ninth Circuit held that "in some limited circumstances . . [a] state court's

4    failure to hold an evidentiary hearing may cause its fact-finding process unreasonable under §

5    2254(d)(2)." Hibbler v. Benedetti 693 F.3d 1140, 1147 (2012). The Ninth Circuit has "never

6    held that a state court must conduct an evidentiary hearing to resolve every disputed factual

7    question." Id. If a state court "could have reasonably concluded that the evidence" already on the

8    record was sufficient to resolve the factual question, the state court's decision not to hold an

9    evidentiary hearing does not render its factfinding process unreasonable. Id. The main

10   consideration is "whether the state's factfinding procedures were reasonable." Id.

11           Here, Petitioner contends that the state court unreasonably applied Strickland

12   when declining to conduct an evidentiary hearing into Petitioner's ineffective assistance of

13   counsel claim. See ECF No. 47, pg. 40 (citing Strickland v. Washington, 466 U.S. 668, 690-91

14   (1984)). As discussed in greater detail in a subsequent section, Strickland established the

15   requirements for demonstrating ineffective assistance of counsel as (1) counsel's performance

16   fell below an objective standard of reasonableness; and (2) prejudice. Strickland, 466 U.S. at 688

17   and 693.  Petitioner next cites to Brumfield, asserting that in that case, "the Supreme Court made

18   clear that where a state court unreasonably determines that a petitioner has failed to make the

19   prima facie showing of relief that would warrant an evidentiary hearing, § 2254(d)(2) applies,

20   and no AEDPA deference is required." Id. at 40 (citing Brumfield v. Cain, 576 U.S. 305, 319-24

21   (2015)).

22           According to Petitioner, the state court's decision to not have an evidentiary

23   hearing for Petitioner's ineffective assistance of counsel claim was unreasonable because, even

24   without the evidentiary hearing, Petitioner "easily established a prima facie case of entitlement

25   to relief." Id. at 41. Petitioner further contends that "counsel's failure to rebut the prosecution's

26   repeated false claims that Ashcraft possessed information that had not been disclosed by law

27   enforcement fell below the prevailing standard of care." ECF No. 47, pg. 39. Respondent's

28   arguments do not address the decision to have an evidentiary hearing specifically, but

                                                7

1    Respondent generally argues that the state court was reasonable in rejecting the ineffective

2    assistance of counsel claim. See ECF No. 50, pg. 6.

3              The Sacramento County Superior Court addressed Petitioner's ineffective

4    assistance of counsel (IAC) claim, beginning its discussion with a summary of the applicable

5    standard under Strickland.  See ECF No. 41-28, pg. 2.  The state court then concluded as

6    follows:

7              Petitioner claims that trial counsel should have further
         investigated Ashcraft's statement to show it was fabricated, unreliable,
8         and biased. In particular, Petitioner claims that Ashcraft's testimony was
         admitted in part because the prosecutor argued that it was reliable and
9         credible because it included information about the crimes that was not
         publicly disclosed, including that burglars used the victim's garage door
10        opener to gain entrance into the home. Petitioner claims that trial counsel
         should have discovered that Detective Turnbull disclosed much of the
11        information to Reggie Gilbert, who was in a relationship with Ashcraft.
         Petitioner speculates that Ashcraft obtained the information from Gilbert
12        instead of from Collins, as she testified. However, the interview of
         Gilbert (attached as Exhibit A) only states that the burglars entered the
13        garage without kicking the door; the garage door opened. Turnbull did
         not say that the burglars used the victim's garage door opener. In
14        contrast, in Ashcraft's statement, she stated that Petitioner told Collins
         that the burglars took the victim's car to his house and used the garage
15        door opener to get inside the house. (Exhibit B at p. 18.) Therefore,
         Petitioner has not shown that a further investigation would have been
16        useful in attacking Ashcraft's credibility. In addition, the trial court did
         not base its decision to admit Ashcraft's testimony solely or even
17        primarily on the fact that she knew information that only the participants
         could have known. Instead, the court considered a variety of information,
18        including that several parts of Ashcraft's statement were corroborated by
         other evidence in the case. The court acknowledged that it was possible
19        that Ashcraft could have gotten this information from some source other
         than Petitioner/Collins, but determined that her statements were
20        sufficiently reliable overall, after considering the totality of the
         circumstances, to be admitted. (See Exhibit C at p. 7.) As a result,
21        Petitioner has not shown that trial counsel's failure to further investigate
         how Ashcraft learned the facts of the crime was unreasonable.

22
         [discussion of IAC claim for failure to call an expert witness omitted]
23
         ECF No. 41-28, pgs. 3-4.
24

25             This Court finds the state court's decision to not have an evidentiary hearing on

26   the ineffective assistance of counsel claim was unreasonable.  Petitioner attached several exhibits

27   to his state writ of habeas corpus petition, including Exhibit C, ECF No. 41-28, pgs. 70-77. The

28   state judge relied on Exhibit C when deciding that Petitioner failed to show he was entitled to

1  relief as to his claim that there was an inadequate investigation into the reliability of Ashcraft's

2  statement. See ECF No. 41-28, pg. 3. The judge stated that Exhibit C showed the reasons behind

3  the trial court's decision to admit Ashcraft's testimony and found Petitioner's argument did not

4  challenge those reasons. See id. However, Exhibit C was a transcript of the preliminary hearing

5  which occurred before the *first* trial, which resulted in a mistrial. See ECF No. 41-1, pg. 273.

6  Petitioner's conviction arose from the second trial, where the trial court admitted Ashcraft's

7  testimony independent from the first trial's preliminary hearing. That Exhibit C was from the

8  preliminary hearing and first trial is evidenced by the fact that Exhibit C reflects that Petitioner's

9  attorney was Mr. Mayorga, who was Petitioner's counsel in the first trial. See ECF No. 41-28,

10  pgs. 70-77.  Mr. Mayorga did not represent Petitioner in the second trial.  The trial court's

11  decision to admit the Ashcraft testimony for the second trial, the trial that resulted in Petitioner's

12  conviction, can be found at ECF No. 41-7, pg. 120. The state court judge miscited the record and

13  did not consider nor address the reasons the testimony was actually admitted in the trial that

14  resulted in Petitioner's conviction.

15        The Court acknowledges that this error was likely due to the fact that Petitioner

16  attached the preliminary hearing transcript to his state writ for habeas corpus, rather than the

17  second trial transcript. This Court has the advantage of seeing records and transcripts from all

18  previous proceedings and therefore was able to see the entire preliminary hearing transcript and

19  the transcript from the second trial. However, reasonable factfinding at the state level would

20  have highlighted the discrepancy between Petitioner's counsel in the provided transcript, Exhibit

21  C, and Petitioner's counsel at the trial that resulted in his conviction. Indeed, Petitioner's state

22  petition clearly stated that Mr. Mayorga was his attorney for the preliminary hearing for the first

23  trial and then, Mr. Coleman was Petitioner's attorney for the second trial. See ECF No. 41-28,

24  pg. 11. Thus, there was an indication that the trial court's decision in the preliminary hearing had

25  no bearing on the trial that resulted in Petitioner's conviction. In noticing that, the state court

26  could have sought out the trial transcript and then addressed the reasons the trial court admitted

27  the evidence against Petitioner. Instead, the state court misstated the record and therefore did not

28  consider the actual reasons the evidence was admitted. Thus, the state court's factfinding

1    procedure was unreasonable.

2    2.    Federal Evidentiary Hearing

3    An evidentiary hearing is required if: (1) the petitioner's allegations would, if

4    true, entitle the petitioner to relief; and (2) the state court has not, after a full and fair hearing,

5    reliably found the facts. See Jones v. Wood, 114 F.3d 1002, 1010 (9th Cir. 1997). Otherwise,

6    whether to hold an evidentiary hearing is within the discretion of the court. See Townsend v.

7    Smith, 372 U.S. 293, 313, 318 (1963). An evidentiary hearing is not appropriate where there are

8    no disputed material facts or where the claims present purely legal questions. See Harris v.

9    Pulley, 885 F.2d 1354, 1378 (9th Cir. 1988).

10    A petitioner is not entitled to an evidentiary hearing where he was at fault for

11    failing to develop the record in state court, unless one of the exceptions outlined in 28 U.S.C. §

12    2254(e)(2) is met. These exceptions are either "a new rule of constitutional law, made retroactive

13    to cases on collateral review by the Supreme Court, that was previously unavailable; or a factual

14    predicate that could not have been previously discovered through the exercise of due diligence."

15    28 U.S.C. § 2254(e)(2).

16    A petitioner must demonstrate due diligence with respect to developing the

17    factual record in state court. "Diligence . . . depends upon whether the prisoner made a

18    reasonable attempt, in light of the information available at the time, to investigate and pursue

19    claims in state court." See Williams v. Taylor, 529 U.S. 420, 435, 437 (2000). To demonstrate

20    diligence a petitioner must, at a minimum, seek an evidentiary hearing in state court. See id.

21    The state court's reliance on the incorrect transcript was due to Petitioner

22    attaching the wrong transcript to his petition. In his state petition, Petitioner did not request an

23    evidentiary hearing, which is needed to show that he exercised due diligence. See ECF No. 41-

24    28. Petitioner failed to develop the record and did not exercise due diligence. Additionally,

25    Petitioner does not contend that there is a new rule of constitutional law or a factual predicate

26    that could not have been previously discovered and therefore, none of the exceptions outlined in

27    28 U.S.C. § 2254(e)(2) apply. Thus, the undersigned finds that Petitioner is not entitled to an

28    evidentiary hearing.

1    **B.    Constitutionality of AEDPA**

2         The District Judge directed the undersigned to consider Petitioner's arguments

3    against AEDPA deference. See ECF No. 65. In supplemental briefing, Petitioner argued that

4    AEDPA deference is not appropriate as to any claims because AEDPA is unconstitutional. See

5    ECF No. 68.  Therefore, as a preliminary matter, the Court will address the constitutionality of

6    AEDPA.

7         1.    AEDPA Standard

8         Because this action was filed after April 26, 1996, the provisions of the

9    Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") are presumptively

10   applicable.  See Lindh v. Murphy, 521 U.S. 320, 336 (1997); Calderon v. United States Dist. Ct.

11   (Beeler), 128 F.3d 1283, 1287 (9th Cir. 1997), cert. denied, 522 U.S. 1099 (1998).  Under

12   AEDPA, federal habeas relief under 28 U.S.C. § 2254(d) is not available for any claim decided

13   on the merits in state court proceedings unless the state court's adjudication of the claim:

> (1) resulted in a decision that was contrary to, or involved an
> unreasonable application of, clearly established Federal law, as
> determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable
> determination of the facts in light of the evidence presented in the State
> court proceeding.

18        Under § 2254(d)(1), federal habeas relief is available only where the state court's

19   decision is "contrary to" or represents an "unreasonable application of" clearly established law.

20   Under both standards, "clearly established law" means those holdings of the United States

21   Supreme Court as of the time of the relevant state court decision.  See Carey v. Musladin, 549

22   U.S. 70, 74 (2006) (citing Williams, 529 U.S. at 412).  "What matters are the holdings of the

23   Supreme Court, not the holdings of lower federal courts."  Plumlee v. Masto, 512 F.3d 1204 (9th

24   Cir. 2008) (en banc).  For federal law to be clearly established, the Supreme Court must provide

25   a "categorical answer" to the question before the state court.  See id.; see also Carey, 549 U.S. at

26   76-77 (holding that a state court's decision that a defendant was not prejudiced by spectators'

27   conduct at trial was not contrary to, or an unreasonable application of, the Supreme Court's test

28

1    for determining prejudice created by state conduct at trial because the Court had never applied

2    the test to spectators' conduct).  Circuit court precedent may not be used to fill open questions in

3    the Supreme Court's holdings.  See Carey, 549 U.S. at 74.

4            In Williams v. Taylor, 529 U.S. 362 (2000) (O'Connor, J., concurring, garnering a

5    majority of the Court), the United States Supreme Court explained these different standards.  A

6    state court decision is "contrary to" Supreme Court precedent if it is opposite to that reached by

7    the Supreme Court on the same question of law, or if the state court decides the case differently

8    than the Supreme Court has on a set of materially indistinguishable facts.  See id. at 405.  A state

9    court decision is also "contrary to" established law if it applies a rule which contradicts the

10   governing law set forth in Supreme Court cases.  See id.  In sum, the petitioner must demonstrate

11   that Supreme Court precedent requires a contrary outcome because the state court applied the

12   wrong legal rules.  Thus, a state court decision applying the correct legal rule from Supreme

13   Court cases to the facts of a particular case is not reviewed under the "contrary to" standard.  See

14   id. at 406.  If a state court decision is "contrary to" clearly established law, it is reviewed to

15   determine first whether it resulted in constitutional error.  See Benn v. Lambert, 283 F.3d 1040,

16   1052 n.6 (9th Cir. 2002).  If so, the next question is whether such error was structural, in which

17   case federal habeas relief is warranted.  See id.  If the error was not structural, the final question

18   is whether the error had a substantial and injurious effect on the verdict, or was harmless.  See id.

19           State court decisions are reviewed under the far more deferential "unreasonable

20   application of" standard where it identifies the correct legal rule from Supreme Court cases, but

21   unreasonably applies the rule to the facts of a particular case.  See Wiggins v. Smith, 539 U.S.

22   510, 520 (2003).  While declining to rule on the issue, the Supreme Court in Williams, suggested

23   that federal habeas relief may be available under this standard where the state court either

24   unreasonably extends a legal principle to a new context where it should not apply, or

25   unreasonably refuses to extend that principle to a new context where it should apply.  See

26   Williams, 529 U.S. at 408-09.  The Supreme Court has, however, made it clear that a state court

27   decision is not an "unreasonable application of" controlling law simply because it is an erroneous

28   or incorrect application of federal law.  See id. at 410; see also Lockyer v. Andrade, 538 U.S. 63,

12

1    75-76 (2003).  An "unreasonable application of" controlling law cannot necessarily be found

2    even where the federal habeas court concludes that the state court decision is clearly erroneous.

3    See Lockyer, 538 U.S. at 75-76.  This is because "[t]he gloss of clear error fails to give proper

4    deference to state courts by conflating error (even clear error) with unreasonableness."  Id. at 75.

5    As with state court decisions which are "contrary to" established federal law, where a state court

6    decision is an "unreasonable application of" controlling law, federal habeas relief is nonetheless

7    unavailable if the error was non-structural and harmless.  See Benn, 283 F.3d at 1052 n.6.

8           The "unreasonable application of" standard also applies where the state court

9    denies a claim without providing any reasoning whatsoever.  See Himes v. Thompson, 336 F.3d

10   848, 853 (9th Cir. 2003); Delgado v. Lewis, 223 F.3d 976, 982 (9th Cir. 2000).   Such decisions

11   are considered adjudications on the merits and are, therefore, entitled to deference under the

12   AEDPA.  See Green v. Lambert, 288 F.3d 1081 1089 (9th Cir. 2002); Delgado, 223 F.3d at 982.

13   The federal habeas court assumes that state court applied the correct law and analyzes whether

14   the state court's summary denial was based on an objectively unreasonable application of that

15   law.  See Himes, 336 F.3d at 853; Delgado, 223 F.3d at 982.

16           2.      Constitutionality of AEDPA

17          Petitioner contends that AEDPA deference is not appropriate as to any claims

18   because AEDPA is unconstitutional in light of the Supreme Court's ruling in Loper Bright

19   Enters. v. Raimondo, 603 U.S. 369 (2024). See ECF No. 68, pg. 7.  In Loper, the Supreme Court

20   held that "Courts must exercise their independent judgment in deciding whether an agency has

21   acted within its statutory authority," rather than deferring to agency interpretation. Loper Bright

22   Enters. v. Raimondo, 603 U.S. 369, 400-412 (2024). This overruled the Supreme Court's prior

23   holding in Chevron, U.S.A., Inc. v. NRDC, Inc., 467 U.S. 837 (1984), which "delegate[ed]

24   ultimate interpretive authority to agencies." Loper at 402. In Loper, the Court relied on the

25   Constitution and balance of powers to conclude that Courts have "special competence in

26   resolving statutory ambiguities." Id. at 400-401.

27   / / /

28   / / /

13

1    Petitioner argues that <u>Loper</u>'s abandonment of agency deference should be

2    extended, and deference under AEDPA should similarly be abandoned because such deference

3    "violates Article III."  ECF No. 68, pg. 7.  Respondent argues that the Supreme Court affirmed

4    the constitutionality of AEDPA in <u>Brown v. Davenport</u>, 596 U.S. 118 (2022), explicitly holding

5    that AEDPA was a "constitutionally valid rule" provided by Congress. <u>See</u> ECF No. 69, pg. 3

6    (quoting <u>Brown</u> at 127).

7    The Supreme Court affirmed the constitutionality of § 2254(d) in <u>Brown</u> and that

8    decision did not rely on the now overruled <u>Chevron</u>. <u>See</u> <u>Brown v. Davenport</u>, 596 U.S. 118

9    (2022). Additionally, the Supreme Court was specific in <u>Loper</u> that deference to agencies is

10   inappropriate because courts, not agencies, have "special competence in resolving statutory

11   ambiguities." <u>Loper,</u> at 400-401. Here, Petitioner seeks to extend this reasoning which addresses

12   agencies formed by the Executive Branch to state courts. <u>See</u> ECF No. 68. This Court finds that

13   such an extension is not appropriate. This Court finds that an extension of <u>Loper</u> would be

14   inappropriate because it did not overrule the precedent that affirmed AEDEPA's constitutionality

15   and therefore, the undersigned rejects Petitioner's argument that AEDPA is unconstitutional.

16   **C.**    **<u>Petitioner's Claims</u>**

17   This Court now addresses the merits of each of Petitioner's claims, which includes

18   consideration of AEDPA deference as to each claim. Petitioner asserts three claims for relief, as

19   follows: (1) trial counsel was ineffective in litigating the motion to exclude Ashcraft's testimony;

20   (2) the prosecution withheld material exculpatory and impeachment evidence in violation of

21   Petitioner's due process rights and <u>Brady v. Maryland</u>; and (3) the trial court violated

22   Petitioner's due process rights by admitting Ashcraft's report of the alleged phone call between

23   Petitioner and Collins. <u>See</u> ECF No. 47. The Court will address each.

24   1.    <u>Ineffective Assistance of Counsel Claim</u>

25   Petitioner argues that Petitioner's counsel failed to rebut the trial court's

26   determination that Ashcraft's testimony was reliable and such a failure amounts to ineffective

27   assistance of counsel. <u>See</u> ECF No. 47, pgs. 38-39. However, upon review of the record, this

28   Court finds that the trial court admitted Ashcraft's testimony under California rules of evidence

1   that do not require a showing of reliability. <u>See</u> California Evidence Code §§ 1320, 1235 and

2   707. Therefore, Petitioner cannot show that, but for counsel's failure to rebut Ashcraft's

3   reliability, the testimony would not have been admitted against Petitioner. Without showing such

4   prejudice, Petitioner cannot prevail on an ineffective assistance of counsel claim.

5           The Sixth Amendment guarantees the effective assistance of counsel.  The United

6   States Supreme Court set forth the test for demonstrating ineffective assistance of counsel in

7   <u>Strickland v. Washington</u>, 466 U.S. 668 (1984).  First, a petitioner must show that, considering

8   all the circumstances, counsel's performance fell below an objective standard of reasonableness.

9   <u>See id.</u> at 688.  To this end, petitioner must identify the acts or omissions that are alleged not to

10  have been the result of reasonable professional judgment.  <u>See id.</u> at 690. The federal court must

11  then determine whether, in light of all the circumstances, the identified acts or omissions were

12  outside the wide range of professional competent assistance.  <u>See id.</u>  In making this

13  determination, however, there is a strong presumption "that counsel's conduct was within the

14  wide range of reasonable assistance, and that he exercised acceptable professional judgment in

15  all significant decisions made."  <u>Hughes v. Borg</u>, 898 F.2d 695, 702 (9th Cir. 1990) (citing

16  <u>Strickland</u>, 466 U.S. at 689).

17          Second, a petitioner must affirmatively prove prejudice.  <u>See</u> <u>Strickland</u>, 466 U.S.

18  at 693.  Prejudice is found where "there is a reasonable probability that, but for counsel's

19  unprofessional errors, the result of the proceeding would have been different." <u>Id.</u> at 694.  A

20  reasonable probability is "a probability sufficient to undermine confidence in the outcome."  <u>Id.</u>;

21  <u>see also</u> <u>Laboa v. Calderon</u>, 224 F.3d 972, 981 (9th Cir. 2000).  A reviewing court "need not

22  determine whether counsel's performance was deficient before examining the prejudice suffered

23  by the defendant as a result of the alleged deficiencies . . . If it is easier to dispose of an

24  ineffectiveness claim on the ground of lack of sufficient prejudice . . . that course should be

25  followed."  <u>Pizzuto v. Arave</u>, 280 F.3d 949, 955 (9th Cir. 2002) (quoting <u>Strickland</u>, 466 U.S. at

26  697).

27  / / /

28  / / /

Petitioner argues that Petitioner's counsel failed to rebut the trial court's determination that Ashcraft's testimony was reliable. See ECF No. 47, pgs. 38-39. Respondent argues that "rejecting an ineffectiveness claim was reasonable" because though Petitioner focused on the reliability of Ashcraft's statements, those statements were admitted under rules of evidence that do not rely on reliability. See ECF No. 50, pgs. 6-7.

Petitioner's trial attorney argued in his written motion in limine that Ashcraft's statement "was so unreliable" it should not be admitted. ECF No. 41-2, pgs. 281-283. In support of this argument, the attorney asserted that months had passed before Ashcraft went to Detective Turnbull, after Ashcraft admittedly researched the case online and that, in that time, Ashcraft did not mention her knowledge to anyone. See id. Additionally, the attorney stated that no phone records support Ashcraft's version of events and other details in her statement, including how long she was in Reno, were found to be untrue. See id. Finally, the attorney argued the testimony should not be admitted because the prosecution was calling Collins for the sole purpose of impeaching him to admit otherwise inadmissible hearsay. See id. at 284-290. At oral arguments, Petitioner's trial attorney reiterated these arguments. See ECF No. 41-7, pgs. 100-101.

After oral arguments, Ashcraft's double-hearsay statement was admitted because, at the first level, Petitioner's alleged confession to Ashcraft was a statement against interest, and at the second level, that Collins told Ashcraft what Petitioner said, and so impeached Collins' testimony that such conversation never happened. See ECF No. 41-7, pgs. 120-124. The trial court considered reliability in the context of admitting Ashcraft's statements against Petitioner's co-defendants, because Petitioner was determined to be unavailable to testify, his co-defendants would not have the opportunity to cross-examine Petitioner. See id. at 120-122.

There, the trial court concluded:

> The Court is aware that the cell phone records do not provide proof of a call made the day after. But based on the totality of the circumstances, the Court is satisfied that the call occurred reasonably close in time to the homicide. In addition, Defendant Miles' statements to witness Collins are additionally trustworthy in that Defendant Miles does not make any apparent effort to shift the blame onto his fellow codefendants. In fact, Defendant Miles apparently tells witness Collins that he was the shooter.
> / / /
> / / /

16

The setting in which these statements were made by Defendant Miles to the witness Collins suggests no motive to speak falsely. Now, most counsel have argued to this Court that I need to consider corroborating evidence. I do not believe that is appropriate for this Court to do so. In fact, I decline to adopt the People's reasoning on page nine at lines twenty-one and twenty-two of their brief which seeks to bolster the trustworthiness test with corroborating evidence. Because Idaho versus Wright, 497 U.S. Supreme Court case at page 823, indicates that that would be impermissible bootstrapping. And so I decline to make those findings.

Thus, I find based on the totality of the circumstances that Defendant Miles' statement against penal interest is admissible against him, and that his statements identifying codefendants Sam and Shorter as participants is also admissible because I find them to be trustworthy and therefore not violative of the confrontation clause.

Id. at 122-123.

Finally, the trial court considered whether multiple layers of hearsay are admissible and, relying on Zapien, concluded it is permitted. See id. at 123-124 (citing People v. Zapien, 4 Cal. 4th 929 (1993)). Additionally, the trial court noted that Collins and Ashcraft could be cross-examined and the jury could "determine[] the credibility of witnesses. And they will have the opportunity to decide whether any of these statements were made in whole or in part and whether they should believe any of those statements in whole or in part." Id. at 124.

Thus, Respondent is correct that, in admitting Ashcraft's testimony against Petitioner, the trial court did not consider reliability because it was admitted under rules of evidence that have no such reliability requirement. See ECF No. 41-7, pgs. 120-124; see California Evidence Code §§ 1320, 1235 and 707. Even though reliability was not a necessary finding under the California rules of evidence, Petitioner's trial counsel did make an argument as to reliability. See ECF No. 41-2, pgs. 281-283. Petitioner is correct that counsel did not point to the fact that many of the details in Ashcraft's testimony were shared to Ashcraft's romantic partner before she went to detectives. See id. However, the trial court was explicit that the decision to admit Ashcraft's testimony did not rely on the prosecution's argument that the information was reliable because it included facts not publicly available. See ECF No. 41-7, pgs. 122-123.

Given the trial court did not consider reliability with regard to admitting the evidence against Petitioner, Petitioner fails to show prejudice here. See Strickland, 466 U.S. at

693. Petitioner's counsel did make a constitutional reliability argument, albeit without the information that Detectives shared information about the murder with Ashcraft's romantic partner, but the trial court did not consider reliability as to the admission against Petitioner. Therefore, this Court cannot find that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694. For these reasons, the undersigned will recommend denying Petitioner's claim as to ineffective assistance of counsel.

2. *Brady* Violation Claim

Petitioner claims that the prosecution withheld material exculpatory and impeachment evidence until after preliminary hearings in violation of his due process rights and Brady v. Maryland, 373 U.S. 83 (1963). See ECF No. 47, pgs. 42-44. However, because there is no clearly established federal law equating delayed disclosure and suppression for Brady purposes, nor caselaw establishing that Brady obligations extend to preliminary hearings, there was no suppression here.

Due process rights are violated when the prosecution suppresses evidence "favorable to an accused . . . where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." Brady v. Maryland, 373 U.S. 83, 87 (1963). The duty to disclose such evidence applies even when there has been no request by the accused, United States v. Agurs, 427 U.S. 97, 110 (1976), and encompasses impeachment evidence as well as exculpatory evidence, United States v. Bagley, 473 U.S. 667, 676 (1985).

Evidence is material for Brady purposes if it "is sufficient to 'undermine confidence' in the verdict." Wearry v. Cain, 577 U.S. 385, 392 (2016) (quoting United States v. Bagley, 473 U.S. 667, 678 (1985)). In sum, for a Brady claim to succeed on collateral review, petitioner must show: (1) that the evidence at issue is favorable to the accused, either because it is exculpatory or impeaching; (2) that it was suppressed by the prosecution, either willfully or inadvertently; and (3) that it was material (or, put differently, that prejudice ensued). Banks v. Dretke, 540 U.S. 668, 691 (2004); Strickler v. Greene, 527 U.S. 263, 281-82 (1999).

/ / /

1        There is no Supreme Court precedent establishing that delayed disclosure can

2    constitute suppression for <u>Brady</u> purposes. The Supreme Court has never clarified or required an

3    exact time for the disclosure of exculpatory evidence. In the foundational case, <u>Brady v.</u>

4    <u>Maryland</u>, the evidence at issue was disclosed to the defendant only after trial, conviction,

5    sentencing, and his conviction was reaffirmed. <u>See Brady</u>, 373 U.S. at 84.

6        Here, Petitioner's claim fails because he is unable to show that any evidence was

7    suppressed by the prosecution in violation of <u>Brady</u>. Petitioner claims that the prosecution

8    withheld material exculpatory and impeachment evidence until after preliminary hearings in

9    violation of his due process rights and <u>Brady</u>, 373 U.S. 83 (1963).  <u>See</u> ECF No. 47, pgs. 42-44.

10   Specifically, Petitioner asserts that the cell phone records showed that the call Ashcraft described

11   in her testimony did not occur.  <u>See id.</u>  According to Petitioner, the records were exculpatory

12   evidence that proved that Petitioner had not called Collins to confess his participation in the

13   crime the day after it occurred.  <u>See id.</u>

14       This claim was raised in Petitioner's third state post-conviction action, which was

15   summarily denied by the California Supreme Court.  <u>See</u> ECF No. 41-30.  Though there is no

16   reasoned state court decision on the merits of this claim, the Court nonetheless concludes that, on

17   the face of the amended petition, Petitioner is not entitled to habeas relief.  The issue at hand is,

18   at most, a delayed disclosure, not suppression. Petitioner concedes "'existing Supreme Court

19   case law does not clearly establish that the prosecution was required to disclose the impeachment

20   information . . . before, rather than after, [the] preliminary hearing' in all cases, <u>Jaffe v. Brown</u>,

21   473 Fed. Appx. 557, 560 (9th Cir. 2012), [but] disclosure 'must be made at a time when

22   disclosure would be of value to the accused.'" <u>Id.</u> at 43 (quoting <u>United States v. Davenport</u>, 753

23   F.2d 1460, 1462 (9th Cir. 1985)). Given that there is no clearly established federal law equating

24   delayed disclosure and suppression for <u>Brady</u> purposes, nor caselaw establishing that <u>Brady</u>

25   obligations extend to preliminary hearings, there was no suppression here. Additionally,

26   Petitioner had this evidence before the trial that resulted in his conviction and therefore could

27   make use of such evidence in that trial. Thus, this Court cannot find that Petitioner is entitled to

28   relief under this claim and will recommend such claim be denied.

3.      Due Process Claims

Petitioner claims that the admission of Ashcraft's report of the alleged phone call between Petitioner and Collins violated Petitioner's right to due process. See ECF No. 47, pgs. 44-47.  Having previously addressed Petitioner's Brady claim about the phone record disclosure, this Court now considers Petitioner's claims that false evidence was presented, and the admission of Ashcraft's statement constituted improper admission of hearsay in violation of Petitioner's due process rights.

Petitioner argues that Ashcraft's statement "was demonstrably false and based on double hearsay" and its' admission "rendered the trial fundamentally unfair, in violation of the Due Process Clause." ECF No. 47, pgs. 45-46 (citing Estelle v. McGuire, 502 U.S. 62, 68-70 (1991)). Petitioner argues that the statement was demonstrably false because (1) Ashcraft insisted that she picked up the call from a specific phone, the day after the murder, while she was in Reno, but the phone records do not show any call occurred on the day or in the place Ashcraft stated; (2) Ashcraft admitted to hearing information about the murders on the street; and (3) Ashcraft's statement "closely echoed the version of events" provided by Detective Turnbull to Ashcraft's romantic partner, including the a claim that was contradicted by the victim's wife's testimony. See ECF No. 47, pgs. 45-47. Additionally, Petitioner contends that the admission of Ashcraft's double hearsay statement was prejudicial because Petitioner did not have the phone records at the preliminary trial and it was admitted as impeachment evidence against the prosecution's own witness. See id. at 46. As Petitioner's trial attorney argued, Petitioner again argues that it was improper for the prosecution to call Collins for the sole purpose to impeach him with Ashcraft's testimony. See id. According to Petitioner, "[i]f the State had not called Collins to the stand, his supposed comments to Ashcraft about the call would have been excluded as hearsay. Nothing in Collins's own account advanced the prosecution's case." Id.

a.      *False Evidence Claim*

The undersigned will recommend that Petitioner's false evidence claim be denied because Petitioner fails to show that the prosecution knew that Ashcraft's testimony was false.

/ / /

20

It is a violation of due process rights for the government knowingly presents false evidence at a trial that results in the conviction of a defendant. <u>Napue v. Illinois</u>, 360 U.S. 264, 269 (1959). Failure to correct the record when false evidence is presented at trial can also constitute a violation of due process. <u>See id.</u> This includes knowingly false evidence that goes to a witness' credibility. <u>See id.</u>

In response to Petitioner's state writ of habeas corpus, the state court addressed the false evidence component of Petitioner's claim in denying Petitioner's first post-conviction action. <u>See</u> ECF No. 41-28. As to the false evidence assertion, the state court held:

> Petitioner claims that "false evidence" was admitted at trial. However, the true nature of the claim is that Ashcraft's testimony was admitted even though it was unreliable, not credible, and biased. Petitioner presents no evidence that Ashcraft's testimony was actually knowingly false. As a result, he has not shown that any false evidence was presented at any trial hearing.

> ECF 41-28, pg. 2.

Petitioner contends that the state court's decision was unreasonable because it "ignored facts in the record cutting against the result it reached." ECF No. 47, pg. 52. Petitioner argues that the state court ignored the fact that Ashcraft's testimony states she knew the call came from her 606 phone number, while in the hotel in Reno. <u>See</u> ECF No. 47, pg. 52. Petitioner is correct that in response to Petitioner's false evidence claim in his state habeas petition, the state court did not discuss those facts. <u>See</u> ECF 41-28, pg. 2.

However, this Court finds that the state court's characterization of Petitioner's claim is reasonable. Petitioner does not, and did not, assert that the prosecution knew Ashcraft's testimony to be false but nonetheless, presented such evidence. Nor does Petitioner contend that the prosecution failed to correct the record when false evidence was presented. Thus, despite the credibility issues Petitioner raises, Petitioner does not assert that the government *knowingly* presented false evidence. Therefore, the undersigned will recommend denying relief as to this claim.

/ / /

/ / /

21

1          b.    *Admission of Ashcraft's Hearsay Testimony*

2                  This Court is concerned with the admission of Ashcraft's statement as

3    impeachment evidence, but, the admission under such basis was not contrary to established

4    federal law nor resulted in an unreasonable determination of the facts. Therefore, AEDPA

5    deference is appropriate as to the evidentiary issue of the admission of Ashcraft's hearsay

6    testimony, and Petitioner is not entitled to habeas relief as to that claim. However, both the trial

7    court and state court's decisions that Ashcraft's testimony was reliable was based on an

8    unreasonable determination of the facts and therefore, those decisions do not merit AEDPA

9    deference. Therefore, this Court then considers the reliability of Ashcraft's statement de novo,

10   finding it was so unreliable, admission of such evidence violated Petitioner's right to due

11   process.

12                 A writ of habeas corpus is available under 28 U.S.C. § 2254 only on the basis of a

13   transgression of federal law binding on the state courts.  See Middleton v. Cupp, 768 F.2d 1083,

14   1085 (9th Cir. 1985); Gutierrez v. Griggs, 695 F.2d 1195, 1197 (9th Cir. 1983).  It is not

15   available for alleged error in the interpretation or application of state law.  Middleton, 768 F.2d

16   at 1085; see also Lincoln v. Sunn, 807 F.2d 805, 814 (9th Cir. 1987); Givens v. Housewright,

17   786 F.2d 1378, 1381 (9th Cir. 1986).  Habeas corpus cannot be utilized to try state issues de

18   novo.  See Milton v. Wainwright, 407 U.S. 371, 377 (1972).

19                 However, a "claim of error based upon a right not specifically guaranteed by the

20   Constitution may nonetheless form a ground for federal habeas corpus relief where its impact so

21   infects the entire trial that the resulting conviction violates the defendant's right to due process."

22   Hines v. Enomoto, 658 F.2d 667, 673 (9th Cir. 1981) (citing Quigg v. Crist, 616 F.2d 1107 (9th

23   Cir. 1980)); see also Lisenba v. California, 314 U.S. 219, 236 (1941).  Because federal habeas

24   relief does not lie for state law errors, a state court's evidentiary ruling is grounds for federal

25   habeas relief only if it renders the state proceedings so fundamentally unfair as to violate due

26   process.  See Drayden v. White, 232 F.3d 704, 710 (9th Cir. 2000); Spivey v. Rocha, 194 F.3d

27   971, 977-78 (9th Cir. 1999); Jammal v. Van de Kamp, 926 F.2d 918, 919 (9th Cir. 1991); see

28   also Hamilton v. Vasquez, 17 F.3d 1149, 1159 (9th Cir. 1994).   To raise such a claim in a

1   federal habeas corpus petition, the "error alleged must have resulted in a complete miscarriage of

2   justice."  Hill v. United States, 368 U.S. 424, 428 (1962); Crisafi v. Oliver, 396 F.2d 293, 294-95

3   (9th Cir. 1968); Chavez v. Dickson, 280 F.2d 727, 736 (9th Cir. 1960).

4           Petitioner argues that the admission of Ashcraft's testimony as impeachment

5   evidence was improper and the state court's decision was based on an unreasonable

6   determination of the facts under §2254(d)(2). See ECF No. 47, pgs. 18 and 51. Petitioner

7   contends that it was unreasonable for the Court of Appeal to conclude that the phone call

8   between Petitioner and Collins did occur, considering the phone records conflict with Ashcraft's

9   testimony about when and where the phone call occurred. See id. at 51. Respondent counters that

10  the admission of Ashcraft's testimony against Petitioner did not necessitate a finding of

11  reliability to satisfy the state evidence exceptions such admission relied on. See ECF No. 50,

12  pgs. 6-7.

13          As previously discussed, there were two layers of hearsay requiring exceptions to

14  admit Ashcraft's testimony and neither, under California rules of evidence, require a finding of

15  reliability. In admitting the second layer of hearsay, the trial court relied on People v. Zapien, 4

16  Cal. 4th 929 (1993), to conclude that admitting multiple layers of hearsay is proper. See ECF

17  No. 41-7, pgs. 123-124 (citing Zapien at 957).

18          After the California Supreme Court decision in Zapien, Defendant Zapien filed a

19  petition for a writ of habeas corpus, raising the claim that the admission of multiple layers of

20  hearsay was "such an egregious violation of California evidentiary law that it constituted a due

21  process violation." Zapien v. Davis, 849 F.3d 787, 794 (9th Cir. 2016).  The Ninth Circuit held

22  that "[b]ecause there is no Supreme Court case establishing the fundamental unfairness of

23  admitting multiple hearsay testimony, *Holley* prohibits us from finding in Zapien's favor on this

24  due process claim." Id. (citing Holley v. Yarborough, 568 F.3d 1091 (9th Cir. 2009)).

25          After the Ninth Circuit's decision in Zapien, the Supreme Court held that the Due

26  Process clause provides additional protection against the admission of evidence "so unduly

27  prejudicial that it renders the trial fundamentally unfair." Andrew v. White, 145 S. Ct. 75, 81

28  (2025) (citing Payne v. Tennessee, 501 U.S. 808, 825 (1991)). Though it is not for "a federal

1    habeas court to reexamine state-court determinations on state-law questions," <u>Estelle v.</u>

2    <u>McGuire</u>, 502 U.S. 62, 67-68 (1991), and here, state evidentiary laws apply, the Due Process

3    clause "may constitute a further bar to admission of, for example, unreliable evidence,"

4    <u>Michigan v. Bryant</u>, 562 U.S. 344, 370 n.13 (2011). Additionally, "general legal principles can

5    constitute clearly established law for purposes of AEDPA so long as they are holdings of this

6    Court." <u>Andrew</u>, at 82.

7          Here, Petitioner does not argue that admitting multiple layers of hearsay itself

8    violates his right to due process, but rather that the prosecution impeached their own witness for

9    the purpose of admitting otherwise inadmissible evidence and the admitted evidence was so

10   unreliable that it resulted in a violation of Petitioner's right to due process.  <u>See</u> ECF No. 47, pg.

11   46. In light of the more recent Supreme Court rulings in <u>Andrew</u> and <u>Michigan</u>, this Court must

12   consider whether the admission of Ashcraft's testimony was "so unduly prejudicial that it

13   renders the trial fundamentally unfair" or was so unreliable, it violated Petitioner's due process

14   rights. <u>Andrew v. White</u>, 145 S. Ct. 75, 81 (2025); <u>Michigan v. Bryant</u>, 562 U.S. 344, 370 n.13

15   (2011).

16         According to the facts recited by the Court of Appeal, the only evidence against

17   Petitioner[2] was Ashcraft's testimony and that Petitioner's phone had been "in the area" where

18   the car was burned about four hours before the police found the car burning. ECF No. 41-22,

19   pgs. 1-5. However, the Court of Appeal vacated Petitioner's arson conviction specifically

20   because Ashcraft's testimony did not include any statement from Petitioner about the burning of

21   the car. <u>See</u> <u>id.</u> at 26. Thus, the only evidence against Petitioner for the crimes he is incarcerated

22   for was Ashcraft's testimony. The admission of a defendant's confession is, on its' face, highly

23   prejudicial and therefore, necessitates a consideration of whether such admission was proper.

24         It is concerning to this Court that the only evidence against Petitioner was

25   admitted as impeachment evidence for a witness the prosecution called for the sole purpose of

26   impeaching him. Ashcraft's statement would likely not be admissible within the Fourth, Fifth,

27

28   _____

     [2]      There was additional cell phone and physical evidence presented against some of
     Petitioner's co-defendants. <u>See</u> <u>id.</u> at 1-5.

1    Seventh, Ninth and Tenth Circuits.[3] Indeed, Respondent never asserts that Collins was called for

2    any other reason than to impeach him with Ashcraft's testimony. See ECF No. 50. Admitting

3    evidence as prejudicial as a confession, especially when it is the sole evidence against an

4    individual, highlights the potential for such admission to "render[] the trial fundamentally

5    unfair." Andrew v. White, 145 S. Ct. 75, 81 (2025). However, this Court finds that the admission

6    as impeachment of their own witness itself is not sufficient to show that the trial was

7    fundamentally unfair because such admission was not contrary to nor an unreasonable

8    application of established federal law.

9         The Court now considers whether it was an unreasonable determination of the

10   facts for the trial and state court to decide that Ashcraft's testimony was reliable. Finding such

11   determination unreasonable, this Court reviews de novo whether Ashcraft's testimony was so

12   unreliable as to violate Petitioner's due process rights. See Michigan v. Bryant, 562 U.S. 344,

13   370 n.13 (2011).

14        In addition to the trial court's consideration of reliability, as previously discussed,

15   the Court of Appeal considered the reliability of Ashcraft's statements due to the reliability

16   requirement to admit the statement against Petitioner's co-defendants.  See ECF No. 41-22.  The

17   California Court of Appeal first outlined the following background:

18   _____

19   [3]       The Fourth, Fifth, Seventh, Ninth and Tenth Circuits have held that the government
     cannot call a witness for the purpose of impeaching them with substantive evidence that is
20   otherwise not admissible. See United States v. Gomez-Gallardo, 915 F.2d 553, 555 (9th Cir.
     1990) ("[T]he government must not knowingly elicit testimony from a witness in order to
21   impeach him with otherwise inadmissible evidence."); United States v. Hogan, 763 F.2d 697,
     702 (5th Cir. 1985) ("the prosecutor may not use such a statement under the guise of
22   impeachment for the primary purpose of placing before the jury substantive evidence which is
     not otherwise admissible" (internal quotations omitted); United States v. Webster, 734 F.2d
23   1191, 1192 (7th Cir. 1984) ("it would be an abuse of the rule, in a criminal case, for the
     prosecution to call a witness that it knew would not give it useful evidence, just so it could
24   introduce hearsay evidence against the defendant in the hope that the jury would miss the subtle
     distinction between impeachment and substantive evidence"); United States v. Morlang, 531
25   F.2d 183, 190 (4th Cir. 1975) ("impeachment by prior inconsistent statement may not be
     permitted where employed as a mere subterfuge to get before the jury evidence not otherwise
26   admissible"); United States v. Peterman, 841 F.2d 1474, 1479 (10th Cir. 1988) (impeachment is
     not proper when "employed as a guise for submitting to the jury substantive evidence that is
27   otherwise unavailable").

28

Before retrial, the trial court considered motions by defendants to exclude the phone conversation between defendant Miles and Collins, as related by Ashcraft. The court reviewed relevant parts of (1) a DVD of the statement that Ashcraft gave to law enforcement, (2) the reporter's transcript of the preliminary hearing, (3) the reporter's transcript of the Evidence Code section 402 hearing held before the first trial, and (4) the reporter's transcript of the first trial. We need not recount the statement or testimony given on each occasion, but instead provide a summary.

On May 21, 2009, five months after the murder of Timothy Brodie, Brittney Ashcraft was interviewed about an unrelated case. She told the detective that she had information about the Brodie murder, but she did not want to get involved. Two months later, on July 15, 2009, she was interviewed about the Brodie murder. She had difficulty remembering all the details from seven months earlier.

Ashcraft reported that, on December 19, 2008, the date of the Brodie murder, she went with her boyfriend, Robert Collins, to defendant Miles's apartment at the Cobblestone Apartments. Several other people were at the apartment. Ashcraft and Collins left the apartment with defendant Miles and defendant Shorter and traveled to defendant Sam's house. Shortly after that, Ashcraft and Collins left for Reno.

Ashcraft believed she and Collins stayed in Reno for five days, but a receipt from the motel showed that they were there only three days. She remembered that, on the morning after they arrived in Reno, defendant Miles called her cell phone, a number with a 606 prefix. She saw who it was on the caller ID, so she handed it to Collins. After the call, Collins told her what defendant Miles told him. Defendant Miles said that, after Ashcraft and Collins left defendant Sam's house, defendant Miles was involved in the robbery and killing of a man. Defendants Miles, Shorter, and Sam lured the victim to defendant Sam's house, where they tied him up. They then took the victim's car over to the victim's house, where they used the garage door opener control to get inside. They tied up the victim's wife and child and took the marijuana at the house. Later, the three men took the victim and his car to defendant Miles's apartment complex, and defendant Miles shot the victim back.

Ashcraft said that defendant Miles told Collins that defendant Sam "set the whole thing up." Defendant Sam called Brodie to come over, and that is when they tied him up.

After Ashcraft and Collins returned to Sacramento from Reno, Ashcraft learned that defendant Miles told Collins that defendants killed Brodie because he knew defendant Sam. Ashcraft also learned that they burned Brodie's car.

Collins testified at the first trial that he did not hear about the Brodie murder until he and Ashcraft were on their way home from Reno. He received the information in a phone call from a friend named Eric Hale. The phone conversation lasted more than 15 minutes. Collins was worried about defendant Miles, who lived in the apartments where the murder occurred, so he called defendant Miles. That conversation lasted more than 10 minutes. Defendant Miles told Collins that nothing happened to him. Collins denied telling Ashcraft (1) that defendant Miles told him he was involved in the Brodie murder or (2) any of the other facts reported by Ashcraft later.

The records for Ashcraft's phone did not show a call from defendant Miles to her phone on the morning after the Brodie murder. When confronted with this information, Ashcraft said that she was not

sure why the call was not on the phone records and that the call may have occurred at some other time.

The trial court admitted the evidence of defendant Miles's statements. It ruled that (1) defendant Miles's statements were declarations against penal interest under Evidence Code section 1230, (2) the statements were not testimonial, and (3) they were sufficiently trustworthy. Concerning the absence of phone records supporting Ashcraft's claim about the call from defendant Miles to Collins, the court said: "The Court is aware that the cell phone records do not provide proof of a call made the day after. But based on the totality of circumstances, the Court is satisfied that the call occurred reasonably close in time to the homicide." On the issue of trustworthiness, the court noted that the conversation between defendant Miles and Collins was between friends and that defendant Miles did not try to minimize his responsibility. Finally, the court found no problem with multiple layers of hearsay. Defendant Miles's statements to Collins were against penal interest, and Collins's statements to Ashcraft were prior statements inconsistent with his claim that he never made the statements.

ECF No. 41-22, pgs. 8-10.

The Court of Appeal then concluded:

> Defendants Miles and Shorter contend that Brittney Ashcraft's statements (and testimony) concerning what Collins told her about his conversation with defendant Miles were not sufficiently reliable to be admissible as a matter of due process and confrontation rights because the phone records did not support her recollection about when the call was made. Defendant Miles goes so far as to say that "Ashcraft's report of the 'phantom' call was demonstrably false." To the contrary, there was sufficient evidence to sustain the trial court's reliability determination.
>
> The trial court, in ruling on the admissibility of Ashcraft's statements, said: "The Court is aware that the cell phone records do not provide proof of a call made the day after [the murder]. But based on the totality of the circumstances, the Court is satisfied that the call occurred reasonably close in time to the homicide."
> [discussion about Ashcraft's testimony itself not being hearsay omitted]
>
> Under these circumstances, the fact that the phone records did not corroborate Ashcraft's statements did not render those statements inadmissible. As the trial court noted, there was communication between Collins and defendant Miles within a reasonable time after the Brodie murder. And the evidence supports an inference that Collins was with Ashcraft when the communication occurred. That Ashcraft, when questioned about the call seven months later (in the case of her recorded statement) or years later (in the case of trial), remembered the call being on a specific phone at a specific time that was not supported by phone records, did not make the statement so unreliable that it was constitutionally inadmissible.
>
> The trial court did not err in admitting the statements of defendant Miles, Collins, and Ashcraft concerning the events surrounding the Brodie murder.

ECF No. 41-22, pgs. 13-15.

/ / /

1    Petitioner argues it was unreasonable for the Court of Appeal to conclude that

2  "there was communication between Collins and defendant Miles within a reasonable time after

3  the Brodie murder. And the evidence supports an inference that Collins was with Ashcraft when

4  the communication occurred." ECF No. 47, pg. 51 (quoting ECF No. 41-22, pg. 15). The trial

5  court similarly concluded that, despite no phone evidence supporting Ashcraft's timeline, other

6  calls "occurred reasonably close in time to the homicide." See ECF No. 41-7, pgs. 122-123.

7  Petitioner argues that it is not reasonable to conclude that Ashcraft mixed up her days by almost

8  a week, especially with the Christmas holiday between them, mixed up that the call came in

9  when Ashcraft was in Sacramento, not Reno, and then assume Ashcraft was with Collins on

10  December 27, 2008, for that call without testimony or evidence from anyone to support that

11  assumption. ECF No. 47, pg. 51. Respondent counters that reliability is for the jury to decide,

12  and cross-examination ensures fairness at trial. ECF No. 50, pg. 11. Respondent contends that

13  Petitioner's claim is not about reliability, but it is actually an insufficient evidence claim. See id.

14    Ashcraft was very specific in her testimony about when and how the call

15  occurred – she stated that she was at the motel in Reno between December 19 and December 21,

16  the call came in on her 606 phone number, the caller ID popped up saying "Jay Ru" (Petitioner is

17  known by this name), and she gave the phone to Collins and he went into the bathroom to talk to

18  Petitioner. See ECF No. 41-8, pgs. 81-82. Ashcraft was asked cross examination if she was

19  "absolutely sure that this phone call from Mr. Miles to Mr. Collins came in on the 606 number

20  when you were in the motel room the next morning?" ECF No. 41-8, pg. 188. Ashcraft

21  responded "Yes, as far as I can remember." Id.

22    The phone records do not support this narrative. The prosecution presented cell

23  phone evidence in their case in chief that showed calls between Ashcraft's 606 number and

24  Petitioner's 2122 phone number. See id. at 574-574. The records showed the first call between

25  the phones on December 19, 2008, lasted for one minute and ten seconds; then a call from

26  Ashcraft's phone to Petitioner's at midnight on the same day for forty-nine seconds; the next call

27  between those phones was on December 22, 2008, for 33 seconds; then on December 27, 2008, a

28  number of calls between the phones totaling 21 minutes and twelve seconds. See id.  On

1    December 27, 2008, both phones were in Sacramento. See ECF No. 41-9, pg. 530.

2              The prosecution conceded that the calls that occurred on the days Ashcraft

3    testified they happened were too short to be the phone call where Petitioner confessed to Collins

4    and instead proffered that it was one of the longer calls that occurred almost a week later. See

5    ECF No. 41-2, pgs. 298-299 (written opposition to motion in limine); see ECF No. 41-7, pgs.

6    108-110 (motion in limine oral argument); see ECF No. 41-9, pg. 381 (opening argument[4]).  The

7    Court of Appeal apparently agreed because their conclusion about the reliability of Ashcraft's

8    statement assumed that the call Ashcraft testified to was the later call, in Sacramento. See ECF

9    No. 41-22, pg. 15. Considering Ashcraft's very clear description of when the call was, how it

10   occurred, and where it occurred, that the cell phone records that do not support that narrative,

11   and there was no testimony or evidence presented that Ashcraft was with Collins at the time of

12   that later call, this was not a reasonable conclusion.

13             Both the trial court and state court's decisions that Ashcraft's testimony was

14   reliable was based on an unreasonable determination of the facts because, as discussed, the facts

15   presented did not show that Ashcraft's testimony was reliable. Finding such a decision to be an

16   unreasonable determination of the facts, those decisions do not merit AEDPA deference, and this

17   Court now considers the reliability of Ashcraft's statement de novo.

18             This Court finds Ashcraft's testimony was unreliable and the admission of her

19   testimony, as the sole evidence against Petitioner, violated Petitioner's right to due process.

20   Michigan v. Bryant, 562 U.S. 344, 370 n.13 (2011). First, the testimony conflicted with the cell

21   phone evidence the prosecution presented at trial, as previously discussed. Additionally, in their

22   trial brief, the prosecution's argued that Ashcraft's testimony was reliable because it "contained

23   facts of the case that had not been released by law enforcement." ECF No. 41-2, pg. 265. The

24   trial court declined to make those findings because it would be "impermissible bootstrapping."

25   See ECF No. 41-7, pgs. 123-124. However, the trial court stated that in preparation for this "key

26   motion," it reviewed transcripts of Ashcraft's statements from the preliminary hearing, her

27
_____

28   [4]      The transcript lists this as the opening argument but, given the context and timing, it
     appears to actually be the prosecution's closing argument.

1    recorded interview with police, the "402 hearing held before honorable Roland Candee," and the

2    trial testimony of Collins and Ashcraft from the first trial. See ECF No. 41-7, pgs. 119-120.

3    Additionally, in rejecting Petitioner's state habeas petition, the state court stated that Ashcraft's

4    testimony "was reliable and credible because it included information about the crimes that was

5    not publicly disclosed, including that the burglars used the victim's garage door opener to gain

6    entrance into the home." ECF No. 41-28, pg. 3. Thus, both the state court and trial court

7    considered information and testimony that asserted that Ashcraft provided the police with

8    information unavailable to the public. The state court relied on such information in denying

9    Petitioner's state writ of habeas corpus. ECF No. 41-28, pg. 3. And, Detective Turnbull testified

10   at the second trial that Ashcraft provided details unavailable to the public. ECF No. 41-8, pgs.

11   54-56 and 60-61.

12          However, the prosecution's assertion and state court's determination that

13   Ashcraft provided details unavailable to the public is not entirely true. The state court was

14   correct in stating that, according to detectives, the fact that the garage door opener was used was

15   not disclosed to the public. That said, months before Ashcraft came forward to Detective

16   Turnbull, her romantic partner, Reggie Gilbert, was interviewed by that same detective, and

17   Detective Turnbull shared the following information with Gilbert:

18   *Det. Turnbull*: Basically, Tim [victim] was going to meet somebody that night
19   that didn't live very far away from him. Twenty minutes later or so, three dudes
     with masks come busting into his house. His wife's in there, his son's in there.
20   They tie 'em up, basically, and steal, take all the pot plants. And are looking for
     money.

21   *Det. Turnbull*: They get into the house by some means, they gain access by
22   kicking in a door, okay? But they got into the garage without kicking a door.

23   *Reggie Gilbert* [Ashcraft's Romantic Partner]: So he had the garage open?

24   *Det. Turnbull*: Well, it's the garage wasn't open, but then it opened. So, they do
     their thing in the house, they leave, and Tim ends up --

25   *Reggie Gilbert*: [unintelligible] knows who it is.

26   *Det. Turnbull*: Tim ends up shot and killed.

27   *Reggie Gilbert*: At the house?

28   *Det. Turnbull*: At the Cobblestone Apartments. And dumped. In the parking lot.

1    *Reggie Gilbert*: What did he leave to go out there or after he got robbed?

2    *Det. Turnbull*: He left to go meet somebody that didn't live very far away.

3    *Reggie Gilbert*: And then he came, was he dead before they came in the house?
     *Det. Turnbull*: No. He was finally killed at Cobblestone. He was, he was,
4    basically, from what we know, he was held captive, or kidnaped away from the
     house, whoever he was going to meet.

5
     *Det. Turnbull*: So basically then Tim goes to meet somebody, okay? Whoever
6    he's going to meet takes him, ties him up, goes rips off his house, takes him
     somewhere else, and kills him.

7
     *Reggie Gilbert*: Is his wife OK?
8
     *Det. Turnbull*: She's ok. She's obviously grieving that it happened, you know,
9    and she was in the house during the whole thing, and obviously she was scared
     enough not to call the police right away, which she didn't.
10
     *Reggie Gilbert*: She should've
11
     *Det. Turnbull*: Probably would have been better. So anyway, yeah. And then
12   basically when we find out who Tim is, because he didn't have his ID on him, we
     find his wife, we go down to his house, and an hour later his car is burning up
13   there around the Triangle. You know, so there's obviously eyes around there,
     ears.
14
     *Reggie Gilbert*: So how, so how often, I mean, right after the car is burning, how
15   soon I mean did all this – did all this happen like back to back to back to back?
     Like its' a one-day thing, or-
16
     *Det. Turnbull*: Tim leaving the house and the home invasion were about a half an
17   hour apart. The home invasion was done to Tim getting killed was probably
     another half hour to forty minutes. And then the car was burned the next night
18   when we finally . . .

19          ECF No. 41-28, pgs. 24-25.

20          Ashcraft's testimony about what Petitioner told Collins was very similar to the

21   facts Detective Turnbull shared with Gilbert (Ashcraft's Romantic Partner). Ashcraft even stated

22   that the victim's "wife and kid" were both bound, ECF No. 41-8, pg. 83, 103-104, 107 and 109,

23   as Detective Turnbull stated, but the wife testified that only she was bound, ECF No. 41-7, pgs.

24   381 and 390 ("He [my son] wasn't tied"); see also ECF No. 41-8, pg. 63. As the state court

25   noted, Detective Turnbull did not share that the garage door opener was used while Ashcraft did

26   provide that fact in her initial recorded interview with Detective Turnbull. See ECF No. 41-28,

27   pg. 3 and 44 (citing ECF No. 41-28, pg. 44). But what Detective Turnbull provided was that the

28   garage door was closed when the perpetrators arrived and then the garage door was opened, not

1    kicked in. ECF No. 41-28, pgs. 24-25. That Ashcraft correctly stated the garage door opener was

2    used does not make her statement reliable. Further, Ashcraft did not testify to the garage door

3    opener being used in the trial that resulted in Petitioner's conviction. ECF No. 41-8, pgs. 83-85.

4           Ashcraft's testimony was not supported by phone records, phone records showed

5    the call could not have occurred between the phones Ashcraft stated were used, at the time she

6    stated, and in the place she said. And, all of the information in her testimony, except for the fact

7    that a garage door opener was used, was provided to Ashcraft's romantic partner months before

8    Ashcraft met with the same Detective who interviewed her romantic partner. When considering

9    all the information before the trial court, state court, and Court of Appeal, it was unreasonable

10   for them to find Ashcraft's testimony reliable. Further, the testimony was unreliable, as shown

11   by the totality of the circumstances, and as a purported confession from a Defendant, its'

12   admission was prejudicial. Thus, admission of Ashcraft's testimony violated petitioner's due

13   process rights. Michigan v. Bryant, 562 U.S. 344, 370 n.13 (2011).

14          The sole evidence presented against Petitioner, as stated in the Court of Appeal's

15   recitation of the facts, was Ashcraft's testimony about Petitioner's confession to Collins. As

16   discussed, Ashcraft's testimony was unreliable because the phone records did not support her

17   narrative and her testimony at the trial that resulted in Petitioner's conviction provided the same

18   information that was shared with Ashcraft's romantic partner before Ashcraft spoke to the

19   Detective.  Given Ashcraft's testimony was the sole evidence upon which Petitioner was

20   convicted, admission of this unreliable testimony "renders the trial fundamentally unfair."

21   Andrew v. White, 145 S. Ct. 75, 81 (2025). For these reasons, the undersigned will recommend

22   granting Petitioner's petition for a writ of habeas corpus based on the claim that the admission of

23   Ashcraft's testimony violated Petitioner's due process rights.

24   / / /

25   / / /

26   / / /

27   / / /

28   / / /

1

### III. CONCLUSION

2          Based on the foregoing, the undersigned orders recommends that Petitioner's

3 amended petition for a writ of habeas corpus, ECF No. 47, be granted as to the claim that the

4 trial court erred in admitting testimony that violated Petitioner's rights under the Due Process

5 Clause.

6          These findings and recommendations are submitted to the United States District

7 Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within 14 days

8 after being served with these findings and recommendations, any party may file written

9 objections with the court.  Responses to objections shall be filed within 14 days after service of

10 objections.  Failure to file objections within the specified time may waive the right to appeal.

11 See Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

12

13 Dated:  September 2, 2025

14                                                  _____
                                                   DENNIS M. COTA
15                                                 UNITED STATES MAGISTRATE JUDGE

16

17

18

19

20

21

22

23

24

25

26

27

28